## Case No. 11,465.

### PULTE v. DERBY et al.

[5 McLean, 328.][1]

Circuit Court, D. Ohio. 1852.

COPYRIGHT—LITERARY PROPERTY—TRANSFER OF RIGHT TO PUBLISHER.

1. Where A, the author of a work in manuscript, contracts with B, a publisher, in writing, but not under seal, or attestation, or acknowledgment, that he may publish a first edition of 1,000 copies, paying A fifteen cents for each copy sold; and if a second edition should be called for, A would revise and correct the first edition, and B should stereotype it, and might print as many copies as he could sell, paying A twenty cents for each copy sold: and B takes out the copyright in his own name, with the knowledge and consent of A, and the first edition being exhausted, stereotypes the corrected manuscript of the second edition, but only prints 1,500 copies of the first impression, and when these are sold, proceeds to print more, called a third edition, accounting to A according to the contract; and then sells the plates to C, in another state, to account to B on the same terms; and A thereupon revises a third edition, and causes it to be stereotyped and printed, and takes out a copyright in his own name; and then seeks an injunction against B and C, who file their cross bill against A, praying an injunction against him: *Held*, that until a copyright has been secured, A may license by parol the publication of his manuscript; and if B takes the copyright in his own name, with the knowledge and acquiescence of A, he is the lawful owner of the copyright, subject to the condition of accounting to A pursuant to the contract.

[Cited in brief in Centennial Catalogue Co. v. Porter, Case No. 2,546. Cited in The "Mark Twain" Case, 14 Fed. 730; Black v. Henry G. Allen Co., 56 Fed. 769.]

[Cited in Carter v. Bailey, 64 Me. 463; Re Rider, 16 R. I. 272, 15 Atl. 72.]

2. B cannot transfer his copyright to C, but may sell the plates and authorize C to publish, still accounting to A, pursuant to the contract, and not diminishing the sales thereby.

[Cited in Re Reider, 16 R. I. 272, 15 Atl. 72.]

3. B is bound to keep the market supplied, and may not refuse to print if he can sell.

4. B was not limited to the number of copies which he might strike off at the first impression of the second edition, but might print any number he could sell, as they should be wanted, during the existence of the copyright.

5. A had no right to print an edition for himself, and take out a copyright, so long as B complied with his contract.

6. In the present case the court has not jurisdiction to grant an injunction either upon the bill or cross bill.

[Cited in Re Rider, 16 R. I. 272, 15 Atl. 72.]

[This was a bill in equity by Joseph H. Pulte, M. D., against Henry W. Derby and others. Heard on an application for an injunction on bill and cross bill.]

Nesmith & Pugh and Morris, Tilden & Bairden, for complainant.

Walker & Kebler and Gholson & Miner, for defendants.

OPINION OF THE COURT. This is a controversy arising out of the following contract: "This agreement, entered into this

[1] [Reported by Hon. John McLean, Circuit Justice.]

16th day of July, 1850, between Dr. J. H. Pulte of the first part, and H. W. Derby & Co. of the second part, witnesseth: That the said Dr. J. H. Pulte does hereby agree to give unto the said H. W. Derby & Co. the exclusive right to print and publish an edition of one thousand copies of a work to be written by the said Dr. J. H. Pulte of the first part, entitled, 'Homœopathic Domestic Physician.' In consideration whereof, the said H. W. Derby & Co. agree to print and publish an edition above mentioned (one thousand copies,) at their own cost and expense, and pay the said Dr. J. H. Pulte the sum of fifteen cents each for all and every copy sold. It is further agreed between the said parties that if the said Derby & Co, find a second edition called for, the said Pulte is to revise and correct a copy of the first edition ready for the press, which the said Derby & Co. agree to have stereotyped at their own cost, having the exclusive use and control of the plates, printing as many copies as they can sell, paying to said Pulte the sum of twenty cents for each and every copy sold; settlement to be made semi-annually from the day of publication, on their note at four months from the date of settlement. (Signed) J. H. Pulte. H. W. Derby & Co."

The first edition of one thousand copies was published and sold. A second edition being called for, stereotype plates were prepared, and the first edition being revised and corrected by the author, a second edition of fifteen hundred copies was printed; and subsequently two thousand copies in addition were published, which was called in the title page the third edition. The plates were then transferred to A. S. Barnes & Co., of New York, under a contract to publish and account to the defendants on the same terms as the contract between the complainant and defendants; and the complainant alleges that the third edition was contrary to his wishes and desires, and in fraud of his rights. And an injunction is prayed against the defendants, to prevent them from further printing, publishing, or selling said third edition. The defendants have filed a cross bill, alleging that the copyright is vested in them; and they pray that the complainant may be enjoined from publishing the book, as he is about to do.

It is first objected by the counsel for the complainant, that although the contract between the parties is in writing, there is no seal annexed, which is necessary, under the statute, to transfer a copyright. Whether a seal is necessary to transfer a copyright, it is not necessary to inquire. The agreement between the parties does not purport to convey the copyright. At the time it was entered into no copyright had been secured; and there is no provision in the agreement, by whom it was to be acquired in future. The contract embraced only the printing and publication of the work, on the terms stated.

It gave the defendants the exclusive right to print and publish an edition of one thousand copies; and should a second edition be called for, the complainant was to revise and correct the first one, and the defendants were to prepare stereotype plates, and to print as many copies, on the terms stated, as "they can sell." We must look out of the contract, to the acts of the parties, in regard to the copyright. And these facts must, necessarily, have a strong bearing upon the contract. It will tend to show how it was understood and construed by the parties to it. It may be observed that in making a mere contract for printing and publishing a work, it is not usual to say any thing about the copyright. That is ordinarily retained by the author, unless there be an agreement or understanding, that the name of the publisher shall be used for that purpose. We must then look at the book itself, and to the appropriate records, to see in whom the copyright is vested. The evidence of this right must appear on the second page of the book published, it must be entered in the records of the clerk of the district court of the United States, and one of the copies must be deposited in the department of state of the United States, the Smithsonian Institute, and the Congressional Library. Until these things are done, the copyright is not perfect; although, by taking the incipient step, a right is acquired, which chancery will protect, until the other acts may be done.

When the agreement was entered into, the complainant had no copyright to convey. He had a right to his manuscript, which the statute protects, and the property in which would be protected at common law. The right to publish this manuscript, which was all that the complainant could give, was provided for in the agreement. It was the interest of both parties to have the copyright secured. Without this, the first publication of it would have abandoned it to the public, and consequently, it could have been of no more value to either party than to any other publishers or authors, who might choose to revise and republish it. The defendants, it appears, secured to themselves the copyright. And the evidence of that right was published on the second page of the book, which was under the eye of the complainant. He, therefore, sanctioned it. Now, this fact goes strongly to show that the contract was intended to operate, as long as the defendants, in the language of the agreement, could "sell the copies of the book." If such were not the understanding of the parties, it is reasonable to suppose that there would have been a restriction to the exercise of this right, in the contract. The counsel for the complainant contend, that a restriction does appear upon the face of the agreement. And this is found, it is said, in the provisions made for the publication of the first and second editions.

The first edition was limited to one thousand copies. And should a second edition be called for, plates were to be provided by the defendants, and they were authorized to "print as many copies as they can sell." Does this limit the second edition to the number of copies that may be struck off at one impression? Such a supposition is contrary to the words of the agreement. The advantage of stereotype plates to the publishers is to enable them to strike off additional copies without delay, and with little increase of expense, as they shall be called for. This is known to all publishers and authors, and this was provided for in the agreement. The defendants were authorized to "print as many copies as they can sell." Now, how are they to ascertain the number of copies they can sell, until the stock on hand shall be exhausted, or nearly exhausted, and a demand is made for more? They are no more able to ascertain this important fact on the publication of the second edition, than on the publication of the first one. The fact can only be known in the progress of the sale, and this shows that the defendants were not to be limited to the publication of the second edition, if they could sell more than happened to be published on that occasion. And it also shows the propriety of preparing the stereotype plates. The contract seems to be susceptible of no other interpretation. The words authorizing the defendants to print as many copies as they can sell, must be stricken out of the contract, to give to it a different construction. Effect must be given to every part of the contract, if one part be not repugnant to another. There is no repugnancy in any part of the contract to the above provision. On the contrary, it harmonizes with every part of the agreement, and especially with the acts of the parties, in having the copyright vested in the defendants, and with the preparation of the plates. Plates, it is believed, are rarely, if ever used, when only one edition or impression of a work is contemplated; they are now uniformly used when a continued and an increasing demand is anticipated. To this view it is objected that there is no provision in the agreement for the third edition. There is only a provision that the defendants may print as many copies as they can sell; and the mere fact of inserting in the title page in the third impression, the "third edition," cannot cut off the defendants from the right expressly given in the agreement. In a court of chancery the substance of a thing is more regarded than the form. Whether the defendants stated in the title page the third impression, or the third edition, is immaterial. The only objection perceived to the title page is, that the third edition purports to have been revised and corrected by the author. This applies to the second edition, and not to the third. But it is supposed to have been an inadvertence, in copying the title-page of the second edition. It is clear, this could not have been

inserted with a view to injure the complainant.

An objection is made to the second part of the agreement, that there is no consideration; that the defendants were not bound to publish a second edition, except at their discretion. This objection comes somewhat late, after the second and third editions are published; and especially after the complainant revised and corrected the first edition, for the second, which, by the agreement, he was bound to do. He made no objection at the time to this part of the contract, but enables the defendants to carry it out, and he realizes all the advantages secured by his contract, from the second edition. Is it not now too late to raise the objection? But, is there a want of mutuality in the contract? If Derby & Co. find a second edition called for, they are bound to prepare the plates and publish a second edition. Now, if a second edition was called for, which is a fact susceptible of proof, could the defendants, in the exercise of their discretion, refuse to publish? Such a ground would be in opposition to the spirit of the contract, and it is supposed that a court of chancery, looking at the whole contract, would have compelled them to publish. The discretion vested in the defendants was not an arbitrary one, but a discretion to be governed by facts, and on the establishment of the facts the right of the complainant should be enforced.

In regard to the cross bill filed by the defendants, charging that the copyright of this work is in them, and praying that the complainant may be enjoined from publishing a revised edition of the work, it is proper to remark, that although the legal title to the copyright is in the defendants, I can only consider it in them for the purposes of the contract. The right covers their interest and protects it, so long as they shall be engaged in the publication and sale of the work. Beyond this, they are not considered as having the right. They can not transfer it. They have no power to assign the copyright, nor to publish the work except upon the terms of the contract; nor has the complainant the right to publish the work, in disregard of the contract. In this respect the parties are bound to each other, and the contract, it is considered, covers the entire printing and publishing of the work. This controversy has, no doubt, arisen from an honest conviction of their rights, under the contract, by the respective parties. The principal cause of the controversy, the necessary multiplication of the copies of the work, cannot be otherwise than gratifying to the complainant. He has given to the country a professional work, which, for the time it has been published, has received an extraordinary degree of public favor; and this is always considered as no equivocal evidence of merit. This, to an author, is far more appreciable than a consideration of dollars and cents. In the contract, no express provision is made for

the revision of the work, beyond the second edition. But the interest of both parties is concerned in increasing the value of the book, by the revisions and additions of the author. This will increase the demand for it, and add to the profit of the publishers. It will also increase the reputation of the complainant as a medical writer. Seeing that the interests of both parties lie in the same direction, I recommend, that as the value of the work shall be increased by the contributions of the complainant, the defendants shall add to his allowance, per copy, such sum as may be reasonable and just.

By the act of 15th of February, 1819 [3 Stat. 481], it is provided: "That the circuit courts shall have original cognizance, as well in equity as at law, of all actions, suits, controversies, and cases arising under any law of the United States, granting or confirming to authors or inventors the exclusive right to their respective writings, inventions, and discoveries," etc. Does the question in this case arise under the copyright law? In the view above taken, the controversy arises out of the contract. The authorship of the complainant is not controverted, nor is it doubted that the copyright is vested in the defendants. There is no question, then, which can be said to arise under the act of congress. On the construction of the contract alone, the rights of the parties depend. And in such a case, I am inclined to think that the circuit court cannot exercise jurisdiction. In the case of Wilson v. Sandford, 10 How. [51 U. S.] 99, the court held that the seventeenth section of the act of 1836 [5 Stat. 124], gives the right of appeal to the supreme court, when the sum in dispute is below two thousand dollars, "in all actions, suits, controversies, or cases arising under the law of the United States, granting or confirming to inventors the exclusive right to their inventions or discoveries," provided the court below shall deem it reasonable to allow the appeal. But, a bill filed on the equity side of the court to set aside an assignment of the patent right, upon the ground that the assignee had not complied with the terms of the contract, is not one of the enumerated cases. In the case of Wilson v. Stolley [Case No. 17,839], at chambers, where a question somewhat similar was presented, I stated that where the controversy grew out of the license or contract, the circuit court had no jurisdiction. In that case, however, Stolley having forfeited his contract by refusing to make the payments required, it was held that Wilson's right under the patent was a ground of jurisdiction. And I find that the view then taken is sustained in a very late case of Warwick v. Hooper, 3 Eng. Law & Eq. 233. The injunction is refused.

PULTZ & WALKLEY CO. (UNION PAPER BAG MACHINE CO. v.). See Cases Nos. 14,392 and 14,393.