## HOWELL v. MILLER et al.

### (Circuit Court of Appeals, Sixth Circuit. November 9, 1898.)

### No. 621.

1. JURISDICTION OF FEDERAL COURTS—SUIT TO PROTECT COPYRIGHT—INFRINGEMENT BY STATE AUTHORITY.

   The eleventh amendment to the constitution cannot be invoked to debar the owner of a copyright from maintaining a suit to protect it from infringement because the defendants are acting in the matter as the agents of a state, and under its authority.

2. SAME—SUIT AGAINST STATE.

   A suit to enjoin the publication, distribution, and sale of an edition of the laws of a state on the ground that it infringes a copyright held by the plaintiff under the laws of the United States is not a suit against the state of which a court of the United States cannot entertain jurisdiction, because the matter for such publication was prepared under direction of a state statute, and is owned by the state, and in its possession, and the defendants are officers and agents of the state, and proceeding in accordance with such statute.

3. COPYRIGHT—EXTENT OF PROTECTION—EDITION OF STATE STATUTES.

   A compiler and publisher of an annotated edition of the statutes of a state may copyright his volumes, and such copyright will cover and pro-

91 F.—9

tect such part of their contents as may fairly be deemed the product of his own labor.

4. SAME — INJUNCTION AGAINST INFRINGEMENT — STATE COMPILATION OF STATUTES.

A court should not interfere by injunction to restrain the publication by a state of a new compilation of its laws determined by its legislature to be required by the public interests, and which has been completed, on the ground that the compiler has appropriated the labor of a former compiler in infringement of his copyright, unless the right to the relief is clearly manifest from the evidence.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

George Gartner, for appellant.

George P. Wanty, for appellees.

Before HARLAN, Circuit Justice, TAFT, Circuit Judge, and CLARK, District Judge.

HARLAN, Circuit Justice. This action was brought in the circuit court of the United States for the Eastern district of Michigan by the appellant, Howell, against the appellees, Lewis M. Miller, Washington Gardner, George A. Steel, William A. French, the Robert Smith Printing Company (a corporation of Michigan), Robert Smith, Edgar Thorpe, and John H. Stephenson. The parties, plaintiff and defendants, are all citizens of Michigan. The plaintiff prepared and published some years ago three volumes known as "Howell's Annotated Statutes of Michigan." The first volume contained the general laws of the state, including the acts of the extra session of the legislature of 1882, with notes and digests of the decisions of the supreme court of Michigan, and an appendix containing the general tax law of 1882. It also contained the Declaration of Independence; the constitution of the United States, with an index; the act of 1787 for the government of the Northwest Territory, with notes and digests of decisions; the act of 1805 for the government of the Michigan territory, with marginal notes; the ordinance of 1836, relating to certain propositions made by congress to Michigan, with marginal notes; the assent of Michigan to the act of congress of June 15, 1836; the act of 1837, admitting Michigan into the Union; and the constitution of Michigan of 1850, with marginal notes, digest of decisions, and index. The second volume was in the same general form. The third was also in the same form, and contained the Public Acts of Michigan passed at the legislative sessions of 1883, 1885, 1887, and 1889. Each volume was copyrighted by the plaintiff, and thereby, it is asserted, he acquired under the laws of the United States "the sole liberty of printing, reprinting, publishing, * * * and vending the same." Rev. St. U. S. § 4952. The bill proceeds upon the ground that another compilation of the statutes of Michigan, in two volumes, had been prepared by the defendant Miller, and was about to be published and distributed by or through the agency of the defendants. The first volume, when this suit was brought, had been printed by direction of the legislature, and was about to be bound and distributed. Such publication and distribution of the new compilation will, it is averred, be an in-

fringement of the rights of the plaintiff under the copyright laws of the United States, and will work irreparable injury to those rights. The circumstances under which the new compilation was prepared for publication and distribution are these: The constitution of Michigan of 1850 forbade any general revision of the laws to be thereafter made, and provided that, when a reprint thereof became necessary, the legislature in joint convention should appoint "a suitable person to collect together such acts or parts of acts as are in force, and without alteration arrange them under appropriate heads and titles"; and that the laws so arranged should "be submitted to two commissioners appointed by the governor, for examination, and if certified by them to be a correct compilation of all general laws in force, shall be printed in such manner as shall be prescribed by law." Article 18, § 15. There were two authorized compilations after the adoption of the constitution of 1850,—the Cooley compilation of 1857, and the Dewey compilation of 1871. In 1882–83 Howell published the first and second volumes of his compilation; and in 1883 the legislature of Michigan passed an act providing that the general laws of the state, as collected and arranged in those volumes, should be received and admitted in all courts and proceedings, and by all officers, "as evidence of the existing laws thereof, with like effect as if published under and by the authority of the state." Sess. Laws 1883, p. 8; 2 How. Ann. St. p. iv. In 1893, Howell published his third volume, known as the "Supplement." By an act passed by the Michigan legislature in 1895 it was provided that all the general laws of the state should be collected and compiled (by a compiler to be appointed by the legislature), without alteration, under appropriate heads and titles, with marginal notes, references, index, and complete digest of the decisions of the supreme court of the state relating to such general laws; the compiler's work to be completed on or before the convening of the legislature of 1897, and placed in the hands of the governor, after having been certified to be correct by two commissioners appointed by him. The compensation of the compiler was fixed at $6,000. The legislature of 1897 was directed to provide for the publication and binding of such recompilation in such manner and form as was deemed best. Sess. Laws Mich. 1895, Act No. 268. The defendant Miller, having been previously selected by the state legislature, duly qualified as compiler under the act of 1895, and entered upon the work prescribed therein. His labors having been partially completed, so far as the manuscript was concerned, the legislature, by an act passed March 10, 1897, provided for the completion, printing, binding, distribution, and sale of said compilation. By that act it was provided that Miller's compilation—after the general laws enacted by that session had been incorporated into it— should be printed, under the supervision of the compiler, "by the state printer as other state printing is done," with a full and complete index, by the consecutive section numbers, in pages of the size and measurement of Howell's Annotated Statutes, with annotations to each section, set in one-half the measure of the text, and arranged in two columns on the page, all on paper of a specified kind,

furnished by the board of state auditors, and bound by the state binders. The act further provided that the compilation should be known as the "Compiled Laws Michigan, 1897," and required an edition of 20,000 copies to be printed and bound by the state printer and binder, and delivered to the secretary of state for distribution, as the public acts were distributed, and, in addition, one copy to be delivered to each senator and representative of the legislature of 1895, and one copy each to the compiler and the two commissioners. The secretary of state was directed by the same act to sell, from time to time, any number of the copies remaining after such distribution, except such number as was held for future distribution, at such price per copy, not less than the actual cost thereof, as the board of state auditors should determine. That act gave the compiler, for services under it, an additional compensation of $2,500. Sess. Laws 1897, Act No. 26. The defendants are all connected with the execution of the acts of 1895 and 1897,—Miller, as stated, being compiler, under appointment of the legislature; Gardner, secretary of state; Steel, state treasurer; French, commissioner of the state land office (the last three officers constituting the board of state auditors, referred to in the act of 1897); the Robert Smith Printing Company, state printer; and Smith, Thorpe, and Stephenson, officers of the printing company. They all denied any connection with the proposed printing, binding, distribution, or sale of the Miller compilation, except as directed by the above acts of the legislature. Twenty thousand copies of the first volume of the Miller compilation having been printed, but not bound, the present suit was brought by Howell. The relief asked by him was: That the defendants be restrained perpetually from distributing or causing to be distributed, and from selling or offering for sale, either the whole or any part of the above compilation of the statutes of Michigan prepared by Miller, and printed by the Robert Smith Printing Company, and from delivering or causing to be delivered to any person, firm, or corporation the manuscript or any printed matter, or any part of the same, forming or intended to form the whole or any part of such compilation as prepared and compiled by Miller; and, further, from distributing or causing to be distributed, selling or offering for sale, the whole or any portion of the matter prepared or printed, intended as "Compiled Laws Michigan, 1897," "2," and "Index," or any part of the same. That it be adjudged that the compilation of the statutes of Michigan prepared by Miller, printed in part and in process of being printed by the Robert Smith Printing Company, constitutes and is a piracy upon Howell's Annotated Statutes of Michigan, and an infringement upon the rights and the property of the plaintiff arising under the acts of congress of the United States respecting copyrights. And that a preliminary writ of injunction be issued, restraining the defendants from parting with, transferring, or delivering to any individual, corporation, or officer the whole or any part of the manuscript prepared by or under the direction of Miller, or the whole or any part of the printed matter of what is to constitute the said "Compiled Laws Michigan, 1897," or any part of such matter, whether in manuscript, printed, or printed and

bound; and further restraining the defendant Gardner from distributing or causing to be distributed, the whole or any part of said Compiled Laws, and the defendants Gardner, Steel, and French from fixing and determining a price per volume for the sale of said compilation, and from selling or offering for sale volume 1, volume 2, or the index prepared under the direction or supervision of Miller, and restraining the said defendants, jointly and individually, from distributing or causing to be distributed, from transferring or causing to be transferred, from selling or causing to be sold, or offering for sale the whole or any part of said "Compiled Laws Michigan, 1897," prepared and compiled by Miller, or under his supervision, whether such compilation be designated by the name or title stated or by any other name or title. A restraining order was entered substantially in accordance with the prayer of the bill, to remain in full force and effect pending the determination of a motion for a preliminary injunction to be thereafter heard upon notice. Subsequently such a motion was heard, and an injunction was denied. The restraining order previously granted was, however, continued in force, but only for the purpose of preventing the distribution and transferring of Miller's compilation pending the consideration and determination of this suit on the present appeal.

The principal contention of the defendants is that, as the granting of the relief asked will directly interfere with the performance of the duties imposed upon them severally by the state in connection with said compilation, the suit must be deemed to be, in legal effect, one against the state. It is said that the defendant Miller, having done his work as compiler under the direction of the state, the results of his labor belong absolutely to the state, and are in its possession; and that the other defendants, the official printer of the state, the state treasurer, the secretary of state, and the commissioner of the land office, have no interest in the subject-matter of the suit, except as public officers charged by statute with the performance of certain duties in connection with the compilation of the laws of the state. Upon these grounds it is contended that an injunction against the defendants would be, in a constitutional and legal sense, an injunction against the state, when the state, although an indispensable party, is not before the court, and cannot be compelled to submit to its jurisdiction. If these views be sound, it would be our duty to affirm the judgment, without considering the merits of the question of infringement. Indeed, as the jurisdiction of the circuit to proceed at all is denied by the defendants, it would be unseemly to discuss the merits of the case without first deciding whether the circuit court had jurisdiction to entertain the suit for any of the purposes of relief set forth in the bill.

The position of the defendants, namely, that the court cannot restrain them from doing what they have been commanded by the state to do, even if what they intend to do will be in violation of the plaintiff's rights, is supposed to be justified by the decision of the supreme court of the United States in Belknap v. Schild, 161 U. S. 10, 25, 16 Sup. Ct. 443. The report of that case shows that the United States was in the possession of and using, at one of its navy yards, a caisson gate con-

·structed under its orders, according to plans and specifications adopted by the bureau of yards and docks,—a board in the naval service of the government. Schild, claiming that the gate had been made in violation of a patent granted to him by the United States for an improvement in caisson gates, brought his suit against Belknap and others, who held and exercised, respectively, at the time, offices at the navy yard at Mare Island, Cal. Part of the relief prayed was that the defendants be restrained by injunction from using the caisson gate containing the plaintiff's patented improvement, and that such caisson gate be destroyed, or delivered up to the plaintiff. The supreme court, after an extended review of the previous cases relating to suits against the United States or against a state, said that "the exemption of the United States from judicial process does not protect their officers and agents, civil or military, in time of peace, from being personally liable to an action of tort by a private person, whose rights of property they have wrongfully invaded or injured, even by authority of the United States"; and "such officers or agents, although acting under the order of the United States, are therefore personally liable to be sued for their own infringement of a patent." It then proceeded to show that the circuit court erred in awarding an injunction against the use by the defendants of the caisson gate in question. Reaffirming the principle announced in a former case (Patterson v. Kentucky, 97 U. S. 501, 506), that the right of property in the physical substance which is the fruit of discovery is altogether distinct from the right in the discovery itself, the court said:

"Title in the thing manufactured does not give the right to use ·the patented invention; no more does the patent right in the invention give title in the thing made in violation of the patent."

After referring to Vavasseur v. Krupp, 9 Ch. Div. 351, 358, 360, the court proceeded:

"In the present case, the caisson gate was a part of a dry dock in a navy yard of the United States, was constructed and put in place by the United States, and was the property of the United States, and held and used by the United States for the public benefit. If the gate was made in infringement of the plaintiff's patent, that did not prevent the title in the gate from vesting in the United States. The United States, then, had both the title and the possession of the property. The United States could not hold or use it, except through officers and agents. Although this suit was not brought against the United States by name, but against their officers and agents only, nevertheless, so far as the bill prayed for an injunction, and for the destruction of the gate in question, the defendants had no individaul interest in the controversy. The entire interest adverse to the plaintiff was the interest of the United States in property of which the United States had both the title and the possession. The United States were the only real party, against whom alone in fact the relief was asked, and against whom the decree would effectively operate. The plaintiff sought to control the defendants in their official capacity, and in the exercise of their official functions, as representatives and agents of the United States, and thereby to defeat the use by the United States of property owned and used by the United States for the common defense and general welfare; and therefore the United States were an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought; and the suit could not be maintained without violating the principles affirmed in the long series of decisions of this court, above cited."

It thus appears that the supreme court, in Belknap v. Schild, proceeded in its judgment upon the ground that the caisson gate used at the navy yard of the United States under the supervision of the officers of the government, had become its property, and that such use could not be enjoined, because an injunction could not operate directly upon the government's use of its own property, when it was not a party to the suit, and could not, without its consent, be sued.

In the more recent case of Tindal v. Wesley, 167 U. S. 204, 221, 17 Sup. Ct. 770, the general subject of suits against the government or against a state was again under consideration. That was an action of ejectment by a citizen of New York in the circuit court of the United States sitting in South Carolina against certain persons for the possession of real property, which was held by the defendants only in their capacity as officers of the state. The defendants insisted that within the meaning of the constitution of the United States the suit was one against the state of South Carolina. But the court rejected that view, and held that the plaintiff was not to be debarred from an adjudication of his claim to the real estate in question, and from a judgment for its possession as against the defendants, simply because such defendants asserted that the property belonged to the state. The court said:

"The settled doctrine of this court wholly precludes the idea that a suit against individuals to recover possession of real property is a suit against the state, simply because the defendant holding possession happens to be an officer of the state, and asserts that he is lawfully in possession on its behalf. We may repeat here what was said by Chief Justice Marshall, delivering the unanimous judgment of this court in U. S. v. Peters, 5 Cranch, 115, 139: 'It certainly can never be alleged that a mere suggestion of title in a state to property in possession of an individual must arrest the proceedings of the court, and prevent their looking into the suggestion, and examining the validity of the title.' Whether the one or the other party is entitled in law to possession is a judicial, not an executive or legislative, question. It does not cease to be a judicial question because the defendant claims that the right of possession is in the government, of which he is an officer or agent. The case here is not one in which judgment is asked against the defendants as officers of the state, nor one in which the plaintiff seeks to compel the specific performance by the state of any contract alleged to have been made by it, nor to enforce the discharge by the defendants of any specific duty enjoined by the state. Nor is it one, like Cunningham v. Railroad Co., 109 U. S. 446, 452, 3 Sup. Ct. 292, 609, above cited, in which the plaintiff seeks to enforce a lien upon real estate in the actual possession of and claimed by the state, where a decree of sale would be fruitless, as no title could be given to the purchaser without the presence of the state as a party to the proceeding. It is a suit against individuals,—a case in which the plaintiff seeks merely the possession of certain real estate once belonging to the state, but which the complaint alleges has become his property, and which, according to the verdict of the jury and the judgment of the court thereon, must, on this record, be taken to belong absolutely to him. The withholding of such possession by defendants is consequently a wrong, but a wrong which, according to the view of counsel, cannot be remedied if the defendants choose to assert that the state, by them as its agents, is in rightful possession. The doors of the courts of justice are thus closed against one legally entitled to possession, by the mere assertion of the defendants that they are entitled to possession for the state. But the eleventh amendment gives no immunity to officers or agents of a state in withholding the property of a citizen without authority of law. And when such officers or agents assert that they are in rightful possession, they must make good that assertion when it is made to appear in a suit against them as individuals that the legal title and right of

possession is in the plaintiff. If a suit against officers of a state to enjoin them from enforcing an unconstitutional statute, whereby the plaintiff's property will be injured, or to recover damages for taking under a void statute the property of the citizen, be not one against the state, it is impossible to see how a suit against the same individuals to recover the possession of property belonging to the plaintiff, and illegally withheld by the defendants, can be deemed a suit against the state. Any other view leads to this result: That if a state, by its officers, acting under a void statute, should seize for public use the property of a citizen, without making or securing just compensation for him, and thus violate the constitutional provision declaring that no state shall deprive any person of property without due process of law (Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 236, 241, 17 Sup. Ct. 581), the citizen is remediless so long as the state, by its agents, chooses to hold his property; for, according to the contention of the defendants, if such agents are sued as individuals wrongfully in possession, they can bring about the dismissal of the suit by simply informing the court of the official character in which they hold the property thus illegally appropriated. It is true that even in such a case the citizen may, if he choose, rely upon the good faith of the state in the matter of compensation. But he is not compelled to part with his property for public use, except upon the terms prescribed by the supreme law of the land, namely, upon just compensation made or secured. * * * We are of opinion that this suit is not one against the state within the meaning of the eleventh amendment, and as the record before us shows that the plaintiff owns the premises, and is entitled to possession as against the defendants, the judgment must be affirmed."

In this state of the law, it cannot be held that the official character of the present defendants constitutes of itself a reason why they may not be enjoined from infringing the rights, if any, which the plaintiff has under the copyright laws of the United States. A state cannot authorize its agents to violate a citizen's right of property, and then invoke the constitution of the United States to protect those agents against suit instituted by the owner for the protection of his rights against injury by such agents. Of course, if property be the subject of litigation, and if the property belong to the state, and is in its actual possession by its officers, a suit against such officers to enjoin them from using and controlling the property would be regarded as a suit against the state, and, for the reasons stated in Belknap v. Schild, would be dismissed by the court.

The defendants, in the case before us, assert that the original manuscript constituting Miller's compilation was and is the property of the state, and for this reason it is assumed that the doctrine of Belknap v. Schild determines the present case in their favor. It may be true—indeed, we think it is true—that the manuscript of the Miller compilation is the property of the state; and the mere preparation of such manuscript and the possession of it by the state do not constitute a legal wrong to the plaintiff. And if this suit had as its only object a decree disturbing the state's possession of that manuscript, and ordering the surrender of it to the plaintiff, or its destruction, so that it could not be used, we should say, according to the rule announced in Belknap v. Schild, that such a suit would be one against the state, and could not be entertained. But such is not the present case. Its principal object is to prevent the defendants from distributing or selling the Miller compilation so far as it has been printed, and from printing the part still in manuscript and in the hands of the public printer to be printed and delivered to the proper officers of the state for distribution and sale. Although the plaintiff may not,

in law, have any ground for complaint because the state officers have that manuscript in their possession, he may nevertheless invoke the aid of a court of equity to restrain the defendants from printing or publishing such manuscript, if the printing or publication thereof would infringe his rights under the laws of the United States. If the plaintiff has a valid copyright, he is entitled, under the constitution and laws of the United States, to the sole liberty of printing, reprinting, publishing, and vending the books copyrighted by him. Rev. St. U. S. § 4952. And the circuit courts, and district courts of the United States having the jurisdiction of circuit courts, are given "power, upon bill in equity, filed by any party aggrieved, to grant injunctions to prevent the violation of any right secured by the laws respecting copyrights, according to the course and principles of courts of equity, on such terms as the court may deem reasonable." Id. § 4970. The jurisdiction thus conferred by statute is in harmony with the principles of equity jurisprudence as recognized at the time of the adoption of the constitution, and it may be exercised for the protection of an individual against any injury to his rights under the copyright statutes by officers of the state. Those officers cannot interpose their official character, or the orders of the state, against such relief as may properly be granted.

It may here be observed that if, before the caisson gate in question in Schild's Case had been constructed, the patentee had applied for the relief necessary to prevent such construction, a different case would have been presented to the supreme court. In the present case, it is alleged, the defendants have printed, and are about to have bound and distributed, part of Miller's compilation, and are about to print, publish, bind, and distribute the balance of the manuscript of such compilation. It would be extraordinary if a court of equity could not stay the hands of the defendants, if what they are about to do will be in violation of the plaintiff's rights as secured by the laws of the United States, and has no other sanction than a legislative enactment which must yield to the legislation of congress enacted under the authority of the constitution of the United States. It cannot be admitted that the law is otherwise in this country, however it may be in countries whose governments are not based upon a written constitution, and whose legislative power is paramount.

We are, then, to inquire whether it appears from the record before us that the plaintiff has rights, under the laws of the United States, which the defendants, acting under legislative sanction, will violate, unless restrained by injunction. It was suggested in argument that no one can obtain the exclusive right to publish the laws of a state in a book prepared by him. This general proposition cannot be doubted. And it may also be said that any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book, whether such book be the property of the state or the property of an individual. If Miller had cut from Howell's books, delivered to him by the state, the general laws of Michigan as therein printed, and the pages so cut out had been used when his compilation was printed,—if this had been done, and nothing more,—there would have been no ground of complaint. But it is said that he did more

than this, and that he appropriated such parts of Howell's books as were the result of the latter's labor and industry. In Banks v. Manchester, 128 U. S. 244, 9 Sup. Ct. 36, it was held that the reporter of the decisions of a court could not copyright 'the opinions of the court, or the statements and headnotes of cases as prepared by the court or by any member thereof. But in Callaghan v. Myers, 128 U. S. 617, 645, 650, 9 Sup. Ct. 177, it was held that "the reporter of a volume of law reports can obtain a copyright for it as an author, and that such copyright will cover the parts of the book of which he is the author, although he has no exclusive right in the judicial opinions published"; citing numerous authorities. Upon like grounds we are of opinion that Howell was entitled to have copyrighted his volumes of Annotated Statutes, and that such copyright covers all in his books that may fairly be deemed the result of his labors. Speaking generally, this would include marginal references, notes, memoranda, table of contents, indexes, and digests of judicial decisions prepared by him from original sources of information; also such headnotes as are clearly the result of his labors. We do not perceive any difficulty in holding that his copyright would embrace all such matters, for they constitute no part of that which is public property, and are plainly produced by the compiler. The motion for an injunction was heard in the circuit court upon the evidence furnished by a comparison of the first printed volume of the Miller compilation with Howell's Annotated Statutes, and by the affidavits of the several defendants. It would have been more satisfactory if the case had gone to a special master for a report as to all those parts of the Miller compilation which were alleged to have been substantially appropriated from Howell's Annotated Statutes. The court below was left to make such comparison for itself, and the labor required in that way has fallen upon this court. Under ordinary circumstances, we should remand the cause, with directions to send the case to a master, before the application for an injunction was finally disposed of. But we refrain from adopting that course in deference to the suggestion on behalf of the state that the public interests might be injured by any serious delay in determining the case.

Among the affidavits used on the hearing of the application for an injunction was one made by the defendant Miller. It was very full and explicit upon all the material issues made by the pleading. The facts stated by him—using substantially the words of the witness—may be thus summarized: In executing his work as compiler he devised a plan of arrangement of the General Statutes of Michigan then in force which differed in arrangement from former compilations, in that the latter were based upon the Revised Statutes of the state of 1846. He took the statutes in force in 1897, and made an arrangement as if there had been no previous compilation. While the earlier compilations had been subdivided into a large number of titles,—the compilation of 1857 having 40 titles, that of 1871 having 41 titles, and Howell's Annotated Statutes having 42 titles,—he divided his compilation into only 19 titles or principal subdivisions, as indicated in his report of December 22, 1896, to the governor of the state. In subdividing the titles of his compilation into parts and chapters, no

attention was paid to subdivisions and chapters in former compilations, except so far as was necessary to preserve intact the chapters of the Revised Statutes of 1846, which chapters were retained so far as their several sections were then in force. Other general enactments of later date, kindred to the subjects of those chapters, were included therewith in the successive chapters of his compilation. In devising the captions to the several titles, parts, and chapters of his compilation, he adopted the captions and the corresponding subdivisions of the revision of 1846, so far as the same were applicable and suited to his purpose. When they were not applicable, and could not be used, he adopted captions essentially new, and adapted to the subject-matter of such subdivisions, so that whenever any title or chapter of the Revised Statutes of 1846 was inserted as being general laws still in force, he preserved and used the titles thereto as they were enacted by the legislature of Michigan when the revision of 1846 was enacted into law. When any general enactment subsequent to the revision of 1846 was included in the compilation, he placed at the head of such enactment the original title thereto as adopted by the legislature; and to subserve the purpose of subheads in the division of chapters he adopted the plan of printing in capital letters the leading words of such titles, as catchwords to the eye, and indicating the subject-matter of the act. He did not use the small-cap subheads used by Howell to indicate corresponding subdivisions of his chapters. In order to indicate the date of enactment and approval and the taking effect of any general statute, he devised the plan of noting the same as a sidenote in the margin of the page opposite the title of the general enactment. For the purpose of indicating the history of each separate section of any general enactment, as to its amendment subsequent to the enactment of the statute, he devised the plan of noting such amendments, the year thereof, the date of approval, and the time of taking effect, together with the section number of such section in all prior compilations of the general laws of the state, in chronological order, in footnotes immediately following such section, so as to show the complete legislative history of each section subsequent to its enactment, and to note its number in the compilations of 1857, 1871, Howell's Annotated Statutes, or in so many of those compilations as it appeared. In collecting together the general statutes in force, and numbering their sections consecutively, as had been done in all prior compilations, he adopted, in order to indicate such consecutive numbering, the plan used by his predecessors Cooley and Dewey in 1857 and 1871, the numbers being inclosed in parentheses at the head of the several sections. In making annotations denoting the legislative and compilation history of the various sections of the general laws of the state, he noted the consecutive numbering of sections as they appeared in Howell's Annotated Statutes, in the same manner as he deemed it his duty to note the same numbering of sections in the prior compilations of 1851 and 1871. In making these annotations relative to enactment, amendment, and section numbering of the sections of the general laws of the state as they appear in the several volumes of the Session Laws, compilations, and Revised Statutes of Michigan, he referred to the original session laws and original compilations, and did not pirate and copy the same

from Howell's Annotated Statutes. His work was based upon original research, and reference to those volumes. In preparing the copy of such notes and annotations, he had the original volumes continually at hand, and continually referred thereto; and in the preparation of such work he used Howell's Annotated Statutes only in the same way in which he used the other authorized compilations of the laws of the state. For the preparation of the copy for the printer, he was furnished by the secretary of state with three complete sets of Howell's Annotated Statutes, and the same number of all the Session Laws after the year 1869. These sets of Howell's Statutes and Session Laws were used by him in preparing copy for the printer; and in the preparation of such copy he took from the pages of such sets of Howell's Statutes and the Session Laws furnished to him, as best suited his convenience, the text of the general laws then in force, and pasted the same upon sheets of paper, leaving sufficient margin for the addition of such sidenotes and footnotes as became necessary for him to add in the completion of his work. So far as any such text was taken from the pages of Howell's Annotated Statutes, only the bare text of the statutes and the sidenotes, as they had long before been printed and published in the pages of the Session Laws of the state and of the prior compilations, were used by him; and in no instance were the annotations contained in Howell's volumes, or the notations of enactment of laws, or the amendment of sections, or consecutive section numbering utilized by him. The use of the pages of Howell's Annotated Statutes in the preparation of the text was necessary, and the three sets of statutes were furnished him by the state for such use, because the state could not furnish copies of the older session laws, they having been long before out of print; and he used such text only so far as it contained the statutes as enacted, and did not use any part of the work of Howell. In order to insure perfect accuracy, it became necessary, on account of the numerous errors in the text of the laws as printed in Howell's Statutes, to compare the same carefully with the original prints of the statutes as issued by the state, which involved great and tedious labor, and resulted in the discovery of errors, which errors and variations were officially reported by him. In the preparation of the digest of the decisions of the supreme court, to be published in connection with the various sections of the general laws of the state, he did not follow the plan or arrangement of similar annotations in Howell's Annotated Statutes, but, instead thereof, he adopted the plan of placing all the annotations to each section immediately following the end thereof, and having the same printed in a double column on the page, instead of in lines running the full width of such page. He classified and arranged such annotations and digests in groups, with original and appropriate side heads for convenience in reference. In preparing the digest of the decisions of the supreme court of Michigan interpreting such statutes, and upon the various subjects involved in the sections of the general laws of the state, he continually referred to the volumes of decisions as published under the authority of the state, framing and writing his digest and condensations from the original reports. In many instances, when the same met his approval, he copied the head-notes or syllabi from those reports. In many other instances he used

the exact language of the court itself, frequently making such slight changes as were necessary to preserve grammatical consistency. He made no use whatever of the annotations and digests of Howell. The correspondence between his work and Howell's he accounted for by the fact that Howell adopted a similar method in the preparation of his work, and used the original headnotes, syllabi, and the original language of the supreme court decisions in the same manner as he did. In preparing copy for the constitution of the United States he used the pamphlet edition of that constitution published by the authority of the general government in 1891 and certified as having been compared with the original in the department of state, April 13, 1891, and found to be correct. The subdivisions of the sections of the articles of the constitution as published in such pamphlet edition did not correspond with the subdivisions of the constitution as published in Howell's Annotated Statutes. The index as published in Howell's Statutes could not be, and was not, used by him. It became necessary to number the paragraphs as contained in the pamphlet edition of that constitution in consecutive order, and then he prepared copy for the index that would correspond. In preparing copy for the constitution of the state he adopted the pamphlet edition thereof, compiled and published under the supervision of the secretary of state in April, 1895, because that copy was certified by the secretary of state to have been carefully compared with the engrossed copy of the constitution on file in his office, and was, therefore, officially certified to be correct. He included as an index to the constitution of the state the same index that was published in connection with the pamphlet compiled and published by the secretary of state. The index so used is the same one that was published by the state department in the Michigan manual continuously, beginning with the session of 1885.

This is a fair summary of the many facts stated by Miller in the affidavit referred to. After carefully comparing the printed part of Miller's compilation with Howell's Annotated Statutes, we do not find that the statements of Miller, in respect of the material issues of fact, are overthrown. At any rate, the evidence tending to show that Miller appropriated the labors of Howell is not of such character as to justify a court of equity in interfering to prevent the printing, publication, distribution, and sale of the compilation recognized by the state legislature. In the brief of the learned counsel for the appellant are given instances in which, it is contended, the notes of Howell have been so copied as to show that Miller did not resort to the original sources of information, but, under the disguise of slight alterations of words and forms of expression, really appropriated the work of Howell. But it is to be observed that those notes relate principally or often to previous statutes and judicial decisions which would be referred to by annotators in substantially the same way, even if they resorted exclusively to the original common sources of information, and did not have before them at the time the books of others who had been engaged in the same kind of work. There are some instances specified in the original brief for the appellant which seem to justify the charge that Miller did appropriate the labors of Howell. In respect of some of those instances, it may be said that the plaintiff claims as his work

references to statutes and decisions which are almost identical with references to be found in former compilations. As contrasted with the extent of the new compilation, the instances cited in the brief of the appellant are not so numerous, and of such character, as to justify the interference of a court of equity. The legislature having determined that the public interests required a new compilation of the laws of the state, and the work having been completed, the court should not interfere by injunction, unless the right to the relief asked is clearly manifest from the evidence. In our judgment, the plaintiff has not made such a case as would justify the interposition of a court of equity by injunction. The order denying the injunction is affirmed.