HARPER & BROS. v. M. A. DONOHUE & CO. et al.

(Circuit Court, N. D. Illinois, E. D. December 29, 1905.)

No. 28,021.

1. COPYRIGHT—RIGHT OF PUBLISHER—CONSTRUCTION OF CONTRACT.

By a contract an English author granted to American publishers the exclusive right to publish a work in the United States, reserving the right of translation and dramatization. The publishers agreed to take all steps necessary under the United States copyright law "to secure their own rights and those of the author in said work." It was also provided that, should the book remain out of print for six consecutive months, the right to publish in book form should revert to the author. *Held*, that the publishers rightfully took out the copyright in their own name, as the only means by which they could protect their own rights in the work.

2. SAME—PERIODICAL—COPYRIGHT OF NUMBER PROTECTS ALL CONTENTS.

Under Copyright Act March 3, 1891, c. 565, § 11, 26 Stat. 1109 [U. S. Comp. St. 1901, p. 3417], which provides that "each number of a periodical shall be considered as an independent publication subject to the form of copyrighting as above," the copyrighting of a number of a periodical as a whole, with notice of such copyright given on the title page or the page following, covers and protects all the articles printed therein.

3. SAME—ABANDONMENT AND FORFEITURE—FOREIGN PUBLICATION.

A United States copyright of a work of an English author by the American publishers is not abandoned or forfeited because of the foreign publication of the work by, or with consent of, the author, without the copyright notice, and without consent of the owners of such copyright.

4. SAME—INFRINGEMENT—REPUBLICATION OF BOOK IMPORTED IN VIOLATION OF STATUTE.

The English author of a novel, by contract, authorized its publication in Great Britain, and also by a separate contract gave the exclusive right of publication in the United States to a firm of American publishers, and the latter copyrighted the work in this country. The English publication was made from type there set and contained no notice of the American copyright. Defendants imported a copy of such publication and proceeded to republish the same in the United States. *Held* that, such book having been imported in violation of Rev. St. 4956, as amended by Act March 3, 1891, c. 565, 26 Stat. 1107 [U. S. Comp. St. 1901, p. 3407], defendants could found no rights thereon, and that their publication was an infringement of the copyright and would be enjoined.

[Ed. Note.—Dedication to public, or abandonment of copyright see note to Werckmeister v. American Lithographic Co., 69 C. C. A. 563.]

In Equity. Suit for infringement of copyright. On motion for preliminary injunction.

W. W. Gurley and Dyrenforth, Dyrenforth & Lee, for complainant.
Newman, Northrup, Levinson & Becker, for defendants.

SANBORN, District Judge.  Katherine Cecil Thurston, the author, is a subject of King Edward VII, and as such has the same privilege of copyright in the United States as if a citizen of this country.   This is secured to her by International Copyright Act March 3, 1891, c. 565, 26 Stat. 1106 [U. S. Comp. St. 1901, p. 3406], the Berne Convention, and the proclamation of the President of July 1, 1891, provided for by such act.  27 Stat. 981.  As author of the work called "The Masquerader, or John Chilcote, M. P." the literary property vested in her consisted, so far as here material, of the following rights, privileges, or powers:   Before publication:  The sole, exclusive interest, use. and control.   The right to its name, to control, or prevent publication.  The right of private exhibition, for criticism or otherwise, reading, representation, and restricted circulation; to copy, and permit others to copy. and to give away a copy; to translate or dramatize the work; to print without publication; to make qualified distribution.   The right to make the first publication.   The right to sell and assign her interest, either absolutely or conditionally, with or without qualification, limitation, or restriction, territorial or otherwise, by oral or written transfer.   Such literary property is not subject either to execution or taxation, because this might include a forced sale, the very thing the owner has the right to prevent.   After publication:  Unrestricted publication, without copyright, is a transfer to the public to do most of the things the author might do, in common with her, except all right of transfer and sale, which remains to the author; but without advantage, since the work has become, by the publication, common property.   The copyright acts substantially give the following additional rights:   To copyright, and thus secure the sole privilege of unlimited multiplication and sale of copies, to sell or transfer the unlimited right of reproduction, sale, and publication, the limited right of serial publication, the right of publication in book form, the right of translation, the right of dramatization, or one or more of these rights in specific territory, and the right to secure a copyright either generally, or in one or more countries whose laws permit it, either in the name of the author or assignee.   Also the right to the author to license the sale or other restricted enjoyment of some lesser right, without the power to copyright.  The author and complainant made a written contract which finally became a binding obligation September 29, 1903.   It contained a grant on the part of the author of the exclusive right of serial publication of "The Masquerader" in Harper's Bazar in the United States and Canada, and the exclusive right of printing and publishing in book form in the United States, and to supply the Canadian market, publication in book form to be simultaneous in the United States and England, or at a date mutually satisfactory to the Harpers and Blackwood & Sons (who published the British edition).   The author contracts not to publish an abridged or other edition or book of similar character tending to interfere with its sale, without the publisher's consent; and that the book does not violate copyright, or contain anything libelous, etc.   The

author reserved the rights of translation and dramatization.  The publishers agreed to pay $2,500 for the serial publication, and a certain royalty on the book; and to take all steps necessary under the United States copyright acts "to secure their own rights and those of the author in said work."  They give no guaranty of securing copyright outside the United States, nor issue special foreign editions, nor sell translation or dramatic rights.  If the book remains out of print for six consecutive months, the right to publish in book form shall revert to the author.

Harper's Bazar is a serial monthly magazine published in the United States.  Blackwood's Magazine is a like publication having a British and an American edition, the former published in Edinburgh and the latter in New York, which are identical, except advertising matter.  The successive chapters of the book were published serially in all these magazines during the year 1904.  Blackwood published, in both the United States and Great Britain, chapters 10, 13, 14, 16, 17, 18, 20, 21, 23, 24, 26, 27, 28, 29, 31, and 32, one month earlier than Harper, and chapters 19, 25, 30, 33, and 34 two months earlier.  Harper & Bros. had no knowledge of, nor did they consent to, the publication in serial form by the Blackwoods in the United States.  The work was simultaneously published by both Harper & Bros. and the Blackwoods in the United States and Great Britain about the 1st of October, 1904.

Harper & Bros. claim copyright on chapters 1 to 27 by virtue of their publication in the Bazar in the January to September numbers, and on the balance by publication in book form.  Their deposit of titles, copyright notices, deposit of numbers, and books were as follows:  On June 12, 1903, they deposited the title of the Bazar thus: "Harper's Bazar, Vol. XXXVIII, No. 1, January, 1904."  On January 2, 1904, the title "Harper's Bazar, Vol. XXXVIII, No. 2, February, 1904," and on the same date like titles, mutatis mutandis, for March to June, 1904, and on June 13, 1904, the titles for the remaining months of 1904, in like form.  And also, not later than the day of the publication of each number, deposited in the New York mail, properly addressed, two copies of each of the several monthly numbers for 1904.  Complainant also printed a copyright notice on the foot of the title page, or page next succeeding, in the January number, the words "Copyright 1903 by Harper & Brothers," and in each succeeding number the words, "Copyright 1904 by Harper & Brothers."  On July 26, 1904, complainant deposited the title of the book, "The Masquerader," with the Librarian of Congress, and on September 28, 1904, and not later than its first publication, it mailed the requisite copies to the Librarian.  The proper copyright notice was printed in every copy of "The Masquerader."  No copyright notice of any description appeared in connection with either the serial publication in Blackwood's Magazine, or in its publication of "John Chilcote, M. P.," in book form.  In 1905 one of the defendants purchased copies of the Blackwood edition of the book in London, and brought them to Chicago.  The defendants caused the book in this form to be printed from type set in Chicago, by the title of "John Chilcote, M. P., or The Masqueraders," and were

proceeding to market it, when this was prevented by a temporary restraining order in this suit.

The question now is whether a like temporary injunction shall be entered. It was admitted at the argument that defendants did not copy the book published by complainant, but used only the Blackwood edition. There are many verbal differences between the two, but it is the same story. The copyright laws, as amended by the international act of 1891, which took effect by its own terms, and partly by presidential proclamation, July 1, 1891, give any author, foreign or domestic, or any proprietor of any book, etc., the right to procure copyright, and thereupon have the sole liberty or monopoly of publication and sale, and of translation and dramatization. It is provided that the type shall be set and plates made in this country; and importation of books not printed from such plates is prohibited. Provision is made for securing nonimportation by furnishing lists of titles to the Treasurer and Postmaster General. Conditions precedent to securing copyright are a deposit of the title of the book or periodical with the Librarian of Congress before the day of first publication in the United States or any foreign country, and of two copies thereof not later than the day of first publication in this or foreign country. A condition subsequent is imposed that no person shall sue for infringement of his copyright unless he gives notice thereof by including a copyright notice in each copy published. A penalty is imposed for printing notice of a book not copyrighted, and its importation prohibited. Each number of a periodical shall be considered as an independent publication, subject to the prescribed form of copyrighting. By the proclamation of July 1, 1891, it appears that Great Britain permits the same rights to American citizens in that country as those here given.

It is first insisted for defendants that Harper & Bros. had no right to take out a copyright in their own names under the contract; or, if the copyright is valid, it is held in trust for the author. It is said that her rights could not be secured except by copyright in her name; that, if the book be out of print, her rights shall revert; that translation and dramatization are included in copyright, and as the contract reserves them the parties must have intended not to grant that power; and that the publication of an abridgment or other edition by the author would infringe complainant's copyright, so that provision of the contract is inconsistent with the grant of copyright power. But the contract expressly provides that the publishers shall secure their own and the author's rights by copyright. Now, it seems clear that the publishers' rights could not possibly be secured except by copyrighting in their own names. If the copyright had been taken in the author's name, any publication by her in Great Britain, in any form, omitting notice of copyright, would have destroyed, not secured, all of the publishers' rights. Such a publication has just been held to destroy the copyright by Judge Kohlsaat in G. & C. Merriam Co. v. United Dictionary Co. (U. S. Circuit Court Northern District of Illinois, opinion filed December 18, 1905) 140 Fed. 768. The publication of the work without copyright by Blackwood & Son shows that Harper & Bros.' rights would have been valueless with the copyright in the

author's name. Copyright in the names of the publishers was thus vital to their rights, and also fully protected the rights of the author. That the contract is fairly so to be construed, see Belford Clarke & Co. v. Charles Scribner & Co., 144 U. S. 488, 12 Sup. Ct. 734, 36 L. Ed. 514; Mifflin v. Dutton, 190 U. S. 265, 23 Sup. Ct. 771, 47 L. Ed. 1043; Pulte v. Derby, 5 McLean, 328, Fed. Cas. No. 11,465. While there is force in the grounds of construction urged by defendants' counsel, yet I think their interpretation would be destructive of all rights given to the publishers by the contract, and should not be sustained.

The decision in the Merriam Case was reversed by the Circuit Court of Appeals. 146 Fed. 354.

It is further urged that the copyrighting of Harper's Bazar, as a magazine, without special copyright of the serial numbers of "The Masquerader," was ineffectual within the decisions of the Supreme Court in Mifflin v. White and Mifflin v. Dutton, 190 U. S. 260, 265, 23 Sup. Ct. 769, 771, 47 L. Ed. 1040, 1043. These are the cases involving "The Professor at the Breakfast Table" and "The Minister's Wooing." The first 10 parts of "The Professor" were published serially in the Atlantic Monthly without claim of copyright, and the remaining parts by a copyright notice covering the entire magazine, in the name of Ticknor & Fields, its publishers. Afterwards Dr. Holmes, the author, published the work in book form, containing proper copyright notice in his own name. It appeared, also, that the author never authorized Ticknor & Fields to copyright in their own names. In the other case Mrs. Stowe, the author, gave to the publishers of the Atlantic Monthly "the sole and exclusive right to publish the work in this country." They published the first 10 numbers without any copyright claim whatever. She then took proper steps to secure a copyright in her own name, and published the novel in book form. Afterwards the publishers brought out the remaining chapters with a copyright notice on the magazine as a whole, in their own names. It was held in the Circuit Court of Appeals that the author abandoned her copyright on the volume by publishing such remaining chapters serially without proper notice of copyright. In the "Professor" case the Supreme Court held that Dr. Holmes never assigned the right to copyright the book, but only gave the right to print, publish, and sell. The publishers were not authorized to copyright, either in their own names or his. The fact that Dr. Holmes himself took out a copyright makes it apparent that the parties had no such intention. The copyright of the magazines containing the final chapters, together with the author's copyright of the book, did not secure a valid copyright, since the object of the notice is to warn the public against the republication of a certain book by a certain author, and no person reading the two copyright notices would know that they related to the same work. On their face they would seem to cover a totally different purpose. It was held that the entry of a book under title by the publishers cannot validate the entry of another book of a different title by another person. A fair inference from this decision is that, if the magazine copyright had been in the name of

Dr. Holmes, the publication of the final chapters would have been protected, but, because the whole work was published serially without any lawful copyright notice whatever, the right to exclusive publication was lost. In the case of "The Minister's Wooing" the final chapters were put out with a notice proper so far as the magazine itself was concerned, but by persons not authorized to copyright the work; and this was done after Mrs. Stowe had published the whole book under proper copyright. As already stated, the appellate court held the magazine publication to have been an abandonment. The Supreme Court held that, so far as the first 29 chapters were concerned, they, at least, became public property. Mrs. Stowe's copyright of the balance would have been valid if it had not afterwards appeared in the magazine. Mrs. Stowe not having given notice in the succeeding numbers of the magazine of her copyright, such publication vitiated it; the publishers' copyright not having given notice of the author's rights. In both cases the court expressed reluctance at being obliged to so decide, and we may well believe a different result would have followed if the magazine copyright had been taken in the authors' names. Besides, the court was construing the law of copyrights as it was in 1860, and before the important amendments of 1891, hereafter referred to.

The almost uniform practical construction of the copyright law has been to give the notice in connection with each number of a magazine, and this has been often sustained. Drone on Copyright, 144. Howell's Annotated Statutes of Michigan was held copyrightable in Howell v. Miller, 91 Fed. 129, 33 C. C. A. 407, including all in the book which might fairly be deemed the result of the compiler's labors; reports of judicial decisions, so far as headnotes or other original matter is concerned, Callaghan v. Myers, 128 U. S. 617, 9 Sup. Ct. 177, 32 L. Ed. 547; newspapers, Harper v. Shoppell (C. C.) 26 Fed. 519; Id. (C. C.) 28 Fed. 613; London "Punch" held copyrightable, Bradley v. Hatten, L. R., 8 Exch. 1. The provisions of the copyright law are to be broadly and liberally construed to insure to the author the product of his brain. Jenkins, J., in Holmes v. Donohue, (C. C.) 77 Fed. 179. In Tribune Co. v. Associated Press (C. C.) 116 Fed. 126, the Chicago Tribune attempted to copyright, under contract, some special telegraphic matter of the London Times, by depositing in the Chicago post office, on the evening before publication. the general title of the newspaper, with serial number and date, and by like deposit, immediately upon publication, of copies of the newspaper, each addressed to the Librarian of Congress. It was held by Judge Seaman that it was at least questionable whether a copyright can thus be secured for a newspaper. But as the defendant did not copy from the Tribune, but directly from the London Times after its publication in England, and as the matter published by the Times and Tribune was not identical, there was no infringement, nor was any copyright thus obtained. In England it was at first held that a newspaper was not a book or periodical in Cox v. Land & Water Journal Co., 39 L. J. Rep. 152, but the contrary was decided in Walter v. Howe, 50 L. J. Rep. 621, in Cate v. Newspaper Co., 58 L. J. Rep.

288, and finally by the Court of Appeals in Trade Auxiliary Co. v. Protection Ass'n, 58 L. J. Rep. 293.

Whatever may have been the true construction of former copyright acts, and whether or not a newspaper is entitled to copyright, I think the international copyright act of 1891 has set the question at rest so far as periodicals like Harper's Bazar are concerned. Section 11 of the act provides as follows: "Each number of a periodical shall be considered as an independent publication, subject to the form of copyrighting as above." 26 Stat. 1109 [U. S. Comp. St. 1901, p. 3417]. The closing words evidently refer to the conditions prescribed for securing and retaining copyright—that is, the deposit of title of the periodical—the two copies thereof, and the notice of copyright to be given on the title page or page immediately following. If the notice of copyright is to be given in connection with each separate article published in a magazine, and not once for all, for all contained in it, the language used to prescribe the duty of giving notice is not well adapted to the object sought; for how is it possible to insert a notice on the title page, not of a periodical, but of an article? The latter may have a title, but hardly a title page; while the former has both. Did the publication of the story in Blackwood's Magazine, both in Great Britain and the United States, or of the British edition of the book, all without notice of copyright, constitute a forfeiture or abandonment of complainant's copyright? This is purely a question of copyright, and not of the underlying literary property. Abandonment, forfeiture, public dedication of the exclusive right of copy may be presented in several aspects: (1) Abandonment or public dedication by the owner of a limited domestic copyright. (2) Acts of abandonment by the owner of foreign copyright. (3) Acts of abandonment by the owner of the remainder of the literary property left after the grant of limited domestic copyright, and which do not infringe on the latter. (4) Acts of the latter kind which do so infringe. I think that domestic copyright is forfeited or abandoned only in the first, and not in the other, cases, and that this conclusion follows clearly from the copyright act of 1874 and from the decisions on abandonment.

It is insisted by counsel for defendants that the acts of the author of abandonment, in the case here, by publishing in England and America without notice of copyright, were binding on Harper & Bros., depriving them, without their own act, of their copyright. It is so argued because the author could not confer upon Harper & Bros. any greater right than she herself possessed; and, assuming that they had the power to copyright in their own name, yet that right would be subject to all subsequent conditions imposed upon the author. But the statute does not require the author to give the copyright notice. It provides that "no person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting in the several copies of every edition published" the form prescribed. It is the owner of the copyright who is to give the notice, and he must insert it in every copy published by himself. The statute did not attempt the impossible or impracticable by compelling him to insert the notice in other publishers' editions, but only those controlled by him-

self. As said by the Supreme Court, in Thompson v. Hubbard, 131 U. S. 123, 9 Sup. Ct. 710, 33 L. Ed. 76:

"The plain declaration of the statute is that no person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting the prescribed words in the several copies of every edition published. This means every edition which he, as controlling the publication, publishes."

Harper & Bros. had no control over the acts of Blackwood & Son, either in Scotland or the United States, and were ignorant of the publication in New York of the American edition of Blackwood. How could they abandon their own copyright without their own volition? Forfeitures are strictly construed. It would be a harsh rule which would compel a publisher to insist in his contract with the author on having his own copyright notice inserted in every copy of the work published by all other persons. This might be highly impracticable, and difficult of execution. The statute should not be given such a construction unless imperatively required by its language, which, as we have seen, means nothing of the kind. In the case of G. & C. Merriam Co. v. United Dictionary Co., already cited, the owner of the copyright, after publishing the book in this country, took the plates to England and there printed and published additional copies, omitting, however, the notice of American copyright. Judge Kohlsaat very properly held this to be an abandonment of the copyright. To constitute abandonment there must be a clear, unequivocal, and decisive act of the person entitled, showing a determination not to have the right relinquished. 1 Cyc. 5. Publication in a foreign country without the consent of the author is not an abandonment (Boucicault v. Wood, 2 Biss. 34, Fed. Cas. No. 1,693), or without the consent of the owner of the exclusive right to publish in this country. Goldmark v. Kreling (C. C.) 35 Fed. 661. See also Haggard v. Waverly Pub. Co., cited in Geo. H. Putnam's work on Copyrights (U. S. C. C. Dist. N. J.) 144 Fed. 490; American Press Ass'n v. Daily Story Pub. Co., 120 Fed. 766, 57 C. C. A. 70, 66 L. R. A. 444. The case of Werckmeister v. Am. Lith. Co. (C. C.) 117 Fed. 360, decides a contrary rule, but one which I think should not be followed. The publication in Blackwoods' American edition seems to have been an infringement on Harper & Bros., not an abandonment by them; but it is not necessary to decide this point.

It is further insisted that as it is admitted defendants' publication is not taken from complainant's book, but from the authorized English edition, published without notice of copyright, the case fails. This position is supported by quotation from Drone on Copyright, 399, 400, and Johnson v. Donaldson (C. C.) 3 Fed. 22. The Chicago Tribune Case is also in point here, since the defendant in that case received and published telegraphic dispatches from the London Times covering extracts from its columns; and it was held that the Tribune could not prevent this by copyrighting its own paper, covering other extracts or articles from the Times. But I think the rule inapplicable to this case, because defendants did something expressly prohibited by the copyright law. Section 4956 [U. S. Comp. St. 1901, p. 3407], as added to in 1891, provided:

"During the existence of such copyright the importation into the United States of any book so copyrighted, or any edition or editions thereof, or any plates of the same, not made from type set * * * within the limits of the United States, shall be and it is hereby prohibited."

Defendants did just what is here prohibited. They imported a substantial copy of "The Masquerader" not made from type set in this country. They are, therefore, within the condemnation of the law. They cannot be allowed to found legal rights on acts made unlawful by being prohibited. In the dictionary case above referred to defendant imported the books, as did defendants here, but they were made from plates made in this country. It did nothing prohibited, and was, with some reluctance on the part of the court, justified in so doing. But see the Merriam Case on appeal (C. C. A.) 146 Fed. 354.

On the question of prohibited importation, a case of the bringing in of a piece of music published in Germany, and on which there was an English copyright, was presented in Pitts v. George & Co., 66 L. J. Ch. 1, 75 L. T. Rep. N. S. 320, where such importation was held unlawful. The international copyright act there in question was, however, quite different from the American copyright law.

The motion for temporary injunction should be granted.