## JOSEPH NASH *vs.* JOHN LATHROP.

Suffolk.   March 10, 11. — May 11, 1886.   W. ALLEN & HOLMES, JJ., absent.

Before 1874, the statutes of the Commonwealth provided for the appointment of a reporter of the decisions of the Supreme Judicial Court, who was required to be sworn to the faithful performance of his duties. The manner in which the decisions were to be reported, and the time in which they were to be published, were also prescribed. He was paid a salary by the State, and given "the profits arising from the publication of his reports." By the St. of 1874, *c.* 43, the reporter was required to keep in a public office the written opinions of the court in all cases argued, until their publication in the reports, and also his dockets and copies of papers in such cases, and to "afford due facilities for their examination." By the St. of 1879, *c.* 280, the Secretary of the Commonwealth was directed to enter into a contract with A. for the publication of the reports, the statute specifying the size, style, and form of the volume, obliging the publisher to sell at a certain price to the public in this State, and at a certain less price to the State, and to pay the reporter a salary. The statute further provided, that the reporter should not be required or allowed to publish the reports; and that the stereotype plates and copyright of the volumes published should be the property of A. *Held*, that A. had no right, under a contract entered into with the Commonwealth in pursuance of the statute, to the first publication of the opinions of the court; and that any one, although not a citizen of the State, had a right to require the reporter to allow copies of such opinions to be made for the purpose of publication.

PETITION for a writ of mandamus to compel the reporter of decisions of this court to allow the petitioner, the publisher of the Daily Law Record, a daily paper devoted to legal intelligence, to examine, and, for the purpose of publication, take copies of the opinions of the court which are in the custody of the respondent as reporter.

The answer averred, that, by the Pub. Sts. *c.* 159, § 61, the respondent was bound to keep in some safe and convenient place in Boston the written opinions of the court in all law cases argued in the several counties, until their publication in the reports, and also his own dockets and copies of papers in such cases, and to afford due facilities for their examination; that he had fully complied with the said statute, and had always furnished and was ready to furnish such facilities; but that this statute did not give the right to take copies or abstracts for publication.

The answer further averred, that by virtue of the St. of 1879, c. 280, and of a contract made in pursuance thereof, and by virtue of the extension of said contract duly made at the expiration thereof in 1884, Little, Brown, and Company had the exclusive right of publication of the reports of the decisions of the Supreme Judicial Court; that the respondent had no right to publish the same, or to furnish the same to others for publication, without the assent of said Little, Brown, and Company; that heretofore the petitioner had been permitted by the respondent, with the assent of said Little, Brown, and Company, to take abstracts of opinions, from time to time, for publication, but that recently the West Publishing Company of St. Paul, Minnesota, and the Lawyers' Coöperative Publishing Company of New York, and other foreign publishers, had availed themselves of the liberty thus granted the petitioner to publish the decisions of this court in the form of reports for sale to the profession, in competition with the authorized series of reports and to the injury of said Little, Brown, and Company, and to the prejudice of the rights secured them by said contract and statute; and that for this reason, at the request of said Little, Brown, and Company, he had refused, and contended that he was bound to refuse, the petitioner the privilege of copying and abstracting opinions for publication.

Annexed to the answer was a copy of the contract therein referred to, executed by the Commonwealth of Massachusetts and by Little, Brown, and Company, on May 1, 1879, which followed the language of the St. of 1879, c. 280, with this exception: that while the statute provides that "the reporter of decisions of the Supreme Judicial Court shall not be required or allowed to publish the reports thereof, but shall prepare and furnish the same to said Little, Brown, and Company seasonably for publication," by the terms of the contract the Commonwealth covenanted that the reporter should prepare and furnish the reports to Little, Brown, and Company, seasonably for publication, and should "not publish, or furnish for publication, any reports of said decisions in any other manner."

The case was heard by *Devens*, J., who found that the statements in the answer were true; that there were two corporations located beyond the Commonwealth, the West Publishing Company and the Lawyers' Coöperative Publishing Company, which

were interested in the procuring of these opinions for publication in the form of weekly reports, and that the petition was in the interest of these corporations as well as of the petitioner, and was for the purpose of enabling the petitioner, and the said corporations through the petitioner, to obtain the opinions; and that the publication of these reports in the form of daily or weekly publications would tend to injure the value of the regular reports to the publishers thereof.

It was agreed that, if mandamus should issue, it should be peremptory. The judge reserved for the opinion of the full court the question whether such mandamus should issue.

*A. Russ & R. R. Bishop*, (*A. M. Howe & G. T. Lincoln* with them,) for the petitioner.

*W. G. Russell & G. Putnam*, for the respondent. 1. If necessary to the decision of this case, it may well be contended that the Commonwealth may copyright or permit a publisher to copyright the opinions of its judges given in the course of their employment. *Gould* v. *Banks*, 53 Conn. 415. Drone on Copyright, 161, 239, 243. Copinger on Copyright, 126. Shortt's Law of Literature, 54.

In England, in early times, the King was accustomed to grant a patent giving the exclusive right to publish books of law. This right of the patentee appears to have been founded on the King's ownership, and on the fact that the judges were paid by him, as well as on his prerogative. *Millar* v. *Taylor*, 4 Burr. 2305. *Roper* v. *Streater*, Skin. 234. *Stationers* v. *Seymour*, 1 Mod. 256, 258. See *Gurney* v. *Longman*, 13 Ves. 493; Drone on Copyright, 161.

When the King ceased to issue law patents, no doubt seems to have been entertained that the copyrights of the reporters covered the opinions as reported by them. *Butterworth* v. *Robinson*, 5 Ves. 709. *Saunders* v. *Smith*, 3 Myl. & Cr. 711.

2. The words in the contract, "or furnish for publication," do not add to the significance of the word "publish," contained in the statute. To furnish for publication is a mode of publishing, — perhaps the only mode open to the reporter, who may fairly be presumed not to be himself a publisher.

3. Whether the Commonwealth has a right of copyright in the opinions of its judges or not, it has undoubtedly the right to

make suitable regulations for the publication of such opinions. Such regulations have been made in this State, for the purpose of securing accurate reports of the decisions of the court; and it is submitted that, under the regulations made, Little, Brown, and Company have the right of the first publication of these decisions.

From an early date, the Commonwealth has prescribed the manner in which the opinions should be published and the reports should be made.

By the St. of 1803, *c.* 133, it was provided that the Governor should appoint some suitable person learned in the law to be the reporter of decisions of the Supreme Judicial Court. He was required to be sworn to the faithful discharge of his duty. He was required to obtain " true and authentic reports of the decisions," and to " annually publish the same." His com-pensation was a salary paid him by the Commonwealth, " to-gether with the profits arising from the publication of his said reports."

Until the passage of the St. of 1879, *c.* 280, the reporter made his own arrangements with his publishers, and owned or sold the copyright of his volumes, and depended for his compensation almost wholly on the profits of his sales.

Down to 1874, the reporter, as custodian of the papers and opinions in the decided cases, kept them at his private office or his house; and no one had access to them, except by his courtesy. The St. of 1874, *c.* 43, was passed to meet the inconvenience occasioned by want of access to the papers in cases decided, but not published. It required the county of Suffolk to furnish a " safe and convenient place " in Boston where the reporter should keep the opinions and other papers, in cases decided in all the counties, " until their publication in the reports," and to " afford due facilities for their examination." It was not desired or expected that the opinions should be published by any one but the reporter, nor in advance of his publication. The evil to be dealt with was the difficulty of knowing the decisions before publication, and the statute was exactly adapted to meet that difficulty. It provided for a fit place for custody of the opinions, and due facilities for their examination. The reporter continued after, as well as before, the St. of 1874, to copyright and publish

the reports. His compensation was unchanged, and was, as before, mainly derived from the profits of sales. If it had been intended to deprive him of the advantage of the right of first publication, which he then enjoyed, and the enjoyment of which was his principal inducement to do the work of his office, some clear language would have been used to express that purpose. To say that he should afford "facilities for examination" does not express any such purpose.

In 1879, the system of publication was changed. The reporter was no longer to own the reports, and obtain his compensation by negotiating with a publisher, who should sell the reports at as high a price as he could get. The State was to contract with a publisher, who should furnish the reports to its citizens at a fixed rate, and pay the reporter a salary. St. 1879, *c.* 280. The obvious motive for this change was the securing of the reports at a cheaper rate, both to the State and to its citizens.

The statute required the publication by Little, Brown, and Company, promptly and within the time required by law; which by the Gen. Sts. *c.* 121, § 52, then in force, was to be within ninety days after the first day of September in each year. It fixed the size, style, and form of the volume, and the price. It forbade the reporter publishing the reports. It required Little, Brown, and Company to pay the reporter a large salary; and, as the only compensation to the publishers, provided that "the stereotype plates and copyright of the volumes published under said contract shall be the property of said firm."

The method contemplated by the statute was a contract with publishers, who alone were to have the right to publish, and who were, in consideration of that right, to sell the reports at a low price. The Legislature meant to secure the lowest possible price. It could only secure that price by giving exclusive rights; and it used language intended and adapted to give such rights. The value of the right of publication would be seriously impaired, if not destroyed, if it did not involve the right of first publication; and the prohibition to the reporter against publication would be worthless, unless it extended to the furnishing for publication to others. These provisions of the statutes are still in force. Pub. Sts. *c.* 159, §§ 56–63.

The manner in which the cases are to be reported is also provided for. Pub. Sts. c. 159, §§ 57, 58. Only "legal questions argued by counsel" are to be reported; and the cases are to be reported, at the "discretion" of the reporter, "more or less at large, according to their relative importance, so as not unnecessarily to increase the size or number of the volumes of reports."

In every particular, therefore, the Legislature has regulated the manner in which the decisions of its highest tribunal shall be promulgated. The rights of the public before publication are carefully limited to the right of examination. See *Gould* v. *Banks, ubi supra.*

4. It is argued, that it is in accordance with public policy that the public should have information, as soon as possible, of what the court has decided, and that this can be attained only by permitting the petitioner, and those in whose interest he is acting, to publish the opinions in their various periodicals. It is, however, far more important that the reports should be "true and authentic," and should be made by a responsible person, over whom the State has control, and whose work is subject to the supervision of the court. On this subject the Legislature has spoken, and has fixed the time in which the reports shall be published.

5. Some reliance is placed by the petitioner on the fact that by § 3 of the St. of 1879, c. 280, the reporter is required to pay all sums of money received by him for copies of opinions to the treasurer of the Commonwealth. No statute, however, requires him to make such copies, and it is obvious that, if he were required to furnish copies of opinions to all who desired them, he would, if he personally made them, be prevented from performing the main duties of his office, and, if he employed a clerk to make them, it would entail a large expense upon him. This section was doubtless passed with knowledge of the practice of the office, which existed at the time of the passage of the act, of furnishing copies of opinions to those lawyers who could not conveniently personally examine them, charging a fee therefor. Such copies have been furnished for private use, and not for publication.

Morton, C. J. [After a statement of the facts of the case.] The questions whether the Commonwealth has an absolute

property in the opinions of the justices after they are filed with the reporter of decisions, whether it has a copyright in such opinions which it can exercise itself or assign to an individual, and whether a copyright on the volumes of the reports covers such opinions, so as to prevent any person from publishing them after they have been published in the volumes of the reports, are not necessarily involved in this case.

It may be decided upon a narrower question, which is, whether the Commonwealth has granted to Little, Brown, and Company the exclusive right of the first publication of the opinions of the justices; in other words, whether it has conferred upon that firm the power of saying that such opinions shall not be made public until they are published in their reports.

The decisions and opinions of the justices are the authorized expositions and interpretations of the laws which are binding upon all the citizens. They declare the unwritten law, and construe and declare the meaning of the statutes. Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes or the decisions and opinions of the justices. Such opinions stand, upon principle, on substantially the same footing as the statutes enacted by the Legislature.

It can hardly be contended that it would be within the constitutional power of the Legislature to enact that the statutes and opinions should not be made known to the public. It is its duty to provide for promulgating them. While it has the power to pass reasonable and wholesome laws regulating the mode of promulgating them, so as to secure accuracy and to give authority to them, we are not called upon to consider what is the extent or the limitation of this power; because we are satisfied that it was not the intention of the Legislature in the statute upon which the respondent relies to limit the previously existing right of the citizen to have free access to the opinions, or to confer upon Little, Brown, and Company the right to restrain any persons from procuring copies of them, whether for their own use or for publication in the newspapers or in law magazines or

papers. The policy of the Commonwealth always has been, that the opinions of the justices, after they are delivered, belong to the public.

The office of reporter of decisions was first established by the St. of 1803, c. 133. His duties were to obtain true and authentic reports of the decisions of the Supreme Judicial Court, and to publish them annually. He was paid a salary by the Commonwealth; "which, together with the profits arising from the publication of his said reports, shall be full compensation for his services."

These provisions, with a change in the amount of the salary, were continued through the two revisions of the laws, until 1879. At first the practice of the justices was to deliver their opinions orally, and the reporter took minutes for his reports. But these opinions were public, and any person present might take minutes and publish them. The statutes did not provide, and no claim was ever made, that the reporter had an exclusive right to the first publication. In later times the practice has been for the justices to write out their opinions* and file them with the reporter, though it occasionally happens that opinions are delivered orally from the bench, and minutes taken by the reporter for his reports. But it has always been customary for the reporter to allow the public free access to the opinions, and to furnish copies upon receiving a reasonable compensation. Up to 1874 no public office was provided for the reporter, but he was obliged to keep his papers at his private office, or at his house. In that year, owing undoubtedly to the difficulty felt by the public in the exercise of the right to examine the opinions of the justices, the Legislature passed a statute, entitled "An act to provide for the custody and examination of the opinions of the Supreme Judicial Court before their publication in the reports." St. 1874, c. 43.

It provided that the reporter shall keep in some safe and convenient place, to be provided by the county of Suffolk, in the city

---

* The first statute which refers to an opinion in writing is the St. of 1826, c. 51, § 2, which provides that, whenever a decision shall be made by the court in the absence of the reporter, "it shall be the duty of the court to communicate such decision to him in writing, the better to enable him to comply with the provisions of law in this behalf enacted."

of Boston, the written opinions of the court in all law cases argued in the several counties, until their publication in the reports, and also his dockets and copies of papers in such cases, and shall afford due facilities for their examination. This statute is a clear recognition of the common right to the knowledge of the opinions of the justices, the object of its enactment being to furnish additional facilities for the exercise of this right.

This statute was in substance reënacted in the revision of 1882, and is now in force. Pub. Sts. c. 159, § 61.

It is in view of this course of legislation, and of this established policy of the Commonwealth, that we must construe the St. of 1879, c. 280, upon which the respondent relies. It provides that the Secretary of the Commonwealth shall make a contract with Little, Brown, and Company for the publication of the reports upon the terms therein contained. By the first section, that firm is to publish the reports promptly, according to a standard therein fixed, to sell them for a fixed price, and to pay the reporter a salary for and towards his compensation and clerk hire. The second section provides that during the term of the contract " the reporter of decisions of the Supreme Judicial Court shall not be required or allowed to publish the reports thereof, but shall prepare and furnish the same to said Little, Brown, and Company seasonably for publication according to said contract," and " the stereotype plates and copyright of the volumes published under said contract shall be the property of said firm." The third section provides that " all sums of money received by the reporter for the copies of opinions, rescripts, and other papers shall be paid over by him quarterly to the Treasurer of the Commonwealth, with a detailed statement of the same."

The contract made in pursuance of the statute contains the provision that the " reporter shall not publish or furnish for publication any reports of said decisions in any other manner," differing from the statute by the addition of the words " or furnish for publication." We do not think that these words add anything to the meaning of the contract. It was understood to be made to carry out the statute. But if the added words are beyond the scope of the statute, and give any right not authorized by it, they are beyond the authority conferred upon the

Secretary, and can have no effect. The respondent does not otherwise contend. We must, therefore, look to the statute only to determine whether the respondent has the right which he claims in his answer.

The purpose of the statute was to make provision for the prompt publication of the series of official reports known as the "Massachusetts Reports," at a reasonable price. The first and second sections look solely to this purpose, and deal with no other subject. They do not in terms confer upon Little, Brown, and Company the power to interfere with the public and common right to examine and procure copies of the opinions of the justices, and they do not, upon any reasonable construction, confer such a power by implication.

The provisions that the reporter, during the term of the contract, "shall not be required or allowed to publish the reports," and that the "copyright of the volumes published under said contract shall be the property of said firm," were necessary to define clearly the rights of the firm and the duties of the reporter. Under the previous laws the reporter was obliged to publish the reports, and he had the copyright in the volumes to his own use. The provisions in question were needed to repeal the existing laws, and to carry out the scheme of the new law. But the Legislature did not attempt to determine whether the copyright covered the opinions of the justices.

The intent of the statute was, that Little, Brown, and Company should have the right of publishing, and the copyright in, the volumes of the reports which had before vested in the reporter. The words "to publish the reports," in the second section, are manifestly used in the same sense in which the same words are used in the first section, and refer to the issue to the public of the "Massachusetts Reports." It would be a strained construction to hold that they were intended to prohibit the reporter from allowing the public the right to examine the opinions, or to procure copies or abstracts.

The third section, providing that the reporter shall account to the State for all sums of money received for copies, tends to show that the Legislature expected that the immemorial custom of furnishing copies to the public would be continued. The construction contended for by the respondent is in deroga-

tion of the rights of the public, and ought not to be adopted unless such was clearly the intention of the Legislature. It was its intention, without doubt, that Little, Brown, and Company should have the exclusive right of publishing the authorized series of Massachusetts Reports; but we cannot see in the statute any intention to give to that firm the right to suppress and keep from the public the opinions of the justices until they should print them in the reports. We are therefore of opinion that the claim of the respondent cannot be sustained.

Similar questions have arisen in several cases in other jurisdictions. While such cases have not the weight of authorities, because each case depends in some measure upon the statute of the State in which it arose, differing from our statute, yet the general current of the cases supports the principles upon which our decision rests. See *Banks* v. *Manchester*, 23 Fed. Rep. 143; *Myers* v. *Callaghan*, 20 Fed. Rep. 441; *Chase* v. *Sanborn*, 4 Cliff. 306; *Little* v. *Gould*, 2 Blatchf. 165; *Banks* v. *West Publishing Co.* 27 Fed. Rep. 50.

In order to prevent misconstruction, we desire to add, that, while it is the duty of the reporter to allow the public free access to the opinions in his custody, he has the right to make such reasonable regulations as to the method of examining and obtaining copies of them as he may deem necessary to secure the safety of his papers and the orderly administration of the affairs of his office. *Mandamus to issue.*