EDITH H. JONES, Circuit Judge:
The issue in this en banc case is the extent to which a private organization may assert copyright protection for its model codes, after the models have been adopted by a legislative body and become “the law”. Specifically, may a code-writing organization prevent a website operator from posting the text of a model code where the code is identified simply as the building code of a city that enacted the model code as law? Our short answer is that as law, the model codes enter the public domain and are not subject to the copyright holder’s exclusive prerogatives. As model codes, however, the organization’s works retain their protected status.

BACKGROUND

[1]

Peter Veeck individually operates “Re-gionalWeb” (<http://regionalweb.texo-ma.net>), a non-commercial website that provides information about north Texas. Sometime in 1997, Veeck decided to post on RegionalWeb the local building codes of Anna and Savoy, two small towns in north Texas that had adopted the 1994 edition of the Standard Building Code written by appellee, Southern Building Code Congress International, Inc. (“SBCCI”). Veeck made a few attempts to inspect several towns’ copies of the Building Code, but he was not able to locate them easily. Eventually, Veeck purchased the 1994 model building codes directly from SBCCI; he paid $72.00 and received a copy of the codes on disk. Although the software licensing agreement and copyright notice indicated that the codes could not be copied and distributed, Veeck cut and pasted their text onto his RegionalWeb. Veeck’s website did not specify that the codes were written by SBCCI. Instead, he identified them, correctly, as the building codes of Anna and Savoy, Texas.
The author of the codes, SBCCI, is a non-profit organization consisting of approximately 14,500 members from government bodies, the construction industry, business and trade associations, students, and colleges and universities. Since 1940, SBCCI’s primary mission has been to develop, promote, and promulgate model budding codes, such as the Standard Plumbing Code, the Standard Gas Code, the Standard Fire Prevention Code, and *794 the Standard Mechanical Code. SBCCI encourages local government entities to enact its codes into law by reference, without cost to the governmental entity. No licensing agreements are executed in connection with legislative adoption, nor does SBCCI keep track of the entities that have adopted its codes. Although SBCCI is a non-profit organization, its annual budget, exceeding $9 million, derives in part from sales of its model codes and is used to fund continuing activities. There are no restrictions or requirements on membership in SBCCI, but non-members are charged considerably more for copies of its codes than are members.
While SBCCI continues to assert its copyright prerogatives — exclusively to publish the codes and license their reproduction and distribution — even as to codes that have been adopted by local entities, the organization insists that it grants liberal permission for copying. To support this contention, SBCCI offered in evidence several dozen letters of permission written to entities as diverse as book publishers, seminar providers, and municipal inspection agencies. Notably, each permit letter carefully circumscribed the amount of copying allowed.
SBCCI’s generosity did not extend to Veeck’s public-service posting of the Anna and Savoy building codes on his website. The organization demanded that he cease and desist from infringing its copyrights. Veeck filed a declaratory judgment action seeking a ruling that he did not violate the Copyright Act. SBCCI counterclaimed for copyright infringement, unfair competition and breach of contract. Both parties moved for summary judgment on the copyright infringement issue.
Finding no genuinely disputed material facts, the district court granted summary judgment in favor of SBCCI, including a permanent injunction and monetary damages. On appeal, a divided panel of this court upheld SBCCI’s copyrights in the municipal building codes posted by Veeck, and it rejected his defenses to infringement based on due process, merger, fair use, copyright misuse and waiver.
We elected to rehear this case en banc because of the novelty and importance of the issues it presents.
DISCUSSION[2]
As the organizational author of original works, SBCCI indisputably holds a copyright in its model building codes. See 17 U.S.C. § 102(a). Copyright law permits an author exclusively to make or condone derivative works and to regulate the copying and distribution of both the original and derivative works. 17 U.S.C. § 106. The question before us is whether Peter Veeck infringed SBCCI’s copyright on its model codes when he posted them only as what they became — building codes of Anna and Savoy, Texas — on his regional website. Put otherwise, does SBCCI retain the right wholly to exclude others from copying the model codes after and only to the extent to which they are adopted as “the law” of various jurisdictions?
The answer to this narrow issue seems compelled by three sources: the Supreme Court’s holding that “the law” is not copy *795 rightable; alternatively, the Copyright Act’s exclusion from its scope of “ideas” or “facts”; and the balance of caselaw.
I. The Supreme Court’s View
Excluding “the law” from the purview of the copyright statutes dates back to this nation’s earliest period. In 1834, the Supreme Court interpreted the first federal copyright laws and unanimously held that “no reporter has or can have any copyright in the written opinions delivered by this Court ...” Wheaton v. Peters, 33 U.S. (8 Pet.) 591, 668, 8 L.Ed. 1055 (1834). The case arose when one of the Court’s official reporters was asserting copyright protection for his annotated compilations of Supreme Court opinions. The Court distinguished between the reporter’s individual work and the Justices’ opinions. The Court’s rejection of copyright for judicial opinions paralleled the principle — recognized by attorneys for both parties— that “[statutes were never copyrighted.”[3] Based on the acknowledged and incontestable analogy with legislative acts, Wheaton held unanimously that “the law” in the form of judicial opinions may not be copyrighted.
The same broad understanding of what constitutes “the law” for copyright purposes underlies the Court’s later decision in Banks v. Manchester, 128 U.S. 244, 9 S.Ct. 36, 32 L.Ed. 425 (1888). The Court there denied a copyright to a court reporter in his printing of the opinions of the Ohio Supreme Court. The Court first noted that whatever work the judges perform in their official capacity cannot be regarded as authorship under the copyright law. As a question of “public policy,” the Court stated that,
there has always been a judicial consensus, from the time of the decision in the case of Wheaton v. Peters, 8 Pet. 591, 8 L.Ed. 1055, that no copyright could, under the statutes passed by Congress, be secured in the products of the labor done by judicial officers in the discharge of their judicial duties. The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or statute.
Banks, 128 U.S. at 253, 9 S.Ct. at 40. (emphasis added). At this point, Banks relied upon a decision of the Massachusetts Supreme Judicial Court, which stated,
[I]t needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the stat *796 utes, or the decisions and opinions of the Justices.
Nash v. Lathrop, 142 Mass. 29, 6 N.E. 559 (1886). The court in Nash further observed that a legislature likewise could not deny public access to statutes.
Banks represents a continuous understanding that “the law,” whether articulated in judicial opinions or legislative acts or ordinances, is in the public domain and thus not amenable to copyright.[4] Modern decisions have followed suit.[5] Significantly, the 1976 Copyright Act specifically denies protection to federal statutes and regulations. 17 U.S.C. § 105. Given the state law foundation of Banks and its progeny, there is no reason to believe that state or local laws are copyrightable. See generally L. Ray Patterson & Craig Joyce, Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations, 36 U.C.L.A. L. Rev. 719, 751-58 (1989); 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 5.06[e] at 5-92 (2000) (“state statutes, no less than federal statutes, are regarded as being in the public domain”); 1 Patry, Copyright Law and Practice 351, 357 (1994).
As governing law, pursuant to Banks, the building codes of Anna and Savoy, Texas cannot be copyrighted.
SBCCI and its numerous amici[6] must limit or circumvent the Banks line of cases in order to prevail. Initially, SBCCI divides Banks into two holdings and concludes that either holding must be squared with the policies and purposes of copyright law. This not insubstantial mode of analysis must be carefully reviewed. •
The first holding of Banks is said to deny copyright to judicial opinions because judges, whose salaries are paid by the government, cannot claim to be “authors” of their official works. SBCCI contends that this discussion shows only that judges have no need of the Copyright Act’s economic incentives in order to author judicial opinions. Banks, it is implied, articulates a utilitarian rationale for denying copyright protection to judicial opinions. SBCCI contrasts government employees with the private “authors” of model codes who allegedly depend on copyright incentives in order to perform their public service. SBCCI concludes that this “prong” of Banks does not apply to private code-writing organizations whose work has been adopted or incorporated into statutes, ordinances, or government regulations. Two courts, in addition to the panel that originally heard this case, have identified the consideration of authorship incentives as a “holding” of Banks. See Practice Management Info. Corp. v. American Medical *797 Ass’n, 121 F.3d 516, 518 (9th Cir.1997), opinion amended by 133 F.3d 1140 (9th Cir.1998);[7] County of Suffolk v. First American Real Estate Solutions, 261 F.3d 179, 194 (2d Cir.2001).
The second “holding” of Banks, which requires “the law” or its exposition to be “free for publication to all,” is recharacter-ized by SBCCI as a “due process” argument. That argument devolves into a factual question concerning public “access” to the law. Because SBCCI contends that there is no dispute about the adequacy of public “access” to its model codes, after their enactment as the building codes of Anna and Savoy, Banks is inapplicable.
The “dual holding” analysis seems to foist on Banks a rationale that the Supreme Court never explicitly articulated. Banks, however, does not bifurcate its holding based on the particular authors’ need of the Copyright Act’s incentives or a factual calculus concerning the “adequacy” of public access to the law. Instead, Banks declares at the outset of its discussion that copyright law in the United States is purely a matter of statutory construction. See Banks, 128 U.S. at 251, 9 S.Ct. at 39. In the next paragraph, the Court points out that the court reporter was not the statutory “author” of the judicial decisions. Then, the Court states that
In no proper sense can the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case, and the syllabus, or head-note, be regarded as their author or their proprietor, in the sense of [the copyright statute] ...
Judges, as is well understood, receive from the public treasury a stated annual salary, fixed by law, and can themselves have no pecuniary interest or proprietorship, as against the public at large, in the fruits of their judicial labors.
128 U.S. at 253, 9 S.Ct. at 40. The Court then broadly defines the judges’ official work and states that as a matter of public policy and judicial consensus, “no copyright could, under the statutes passed by Congress, be secured in the products of the labor done by judicial officers in the discharge of their official duties.” This paragraph of Banks climaxes with the explanation:
The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or statute. Id. at 253-54, 9 S.Ct. 36 [citing Nash v. Lathrop ].
There is simply no independent holding in Banks that judges are not “authors” under the copyright law because, as public officials, they do not need the “incentives” that copyright law affords in order to write opinions. Instead, Banks refers to the source of the judges’ salary in order to explain that it is the public at large, not the judges, who have the “pecuniary interest or proprietorship” in “the fruits of their judicial labors.” The whole of those judicial labors, as Banks immediately defines them, “constitutes the authentic exposition and interpretation of the law,” which is “free for publication to all ...” Id.[8]
*798 Moreover, when viewed in light of Wheaton, the last ease relied on by Banks’s analysis, the argument for bifurcation is seriously weakened. Wheaton’s holding, as has been shown, derives from an analogy between judicial opinions and legislative acts as together constituting “the law,” which is not subject to copyright.
The 'origin of the bifurcated holding interpretation of Banks seems to lie in the First Circuit’s thoughtful opinion in Building Officials and Code Adm. v.Code Technology, Inc., 628 F.2d 730 (1st Cir.1980), but the First Circuit does not endorse bifurcation. In this opinion, which will be discussed further infra, the First Circuit considered the argument of BOCA, the model code writer, urging copyright protection for a model building code similar in origin and purpose to the one before us. BOCA’s argument, the court said, “implies that the rule of Wheaton v. Peters was based on the public’s property interest in work produced by legislators and judges, who are, of course, government employees.” BOCA, 628 F.2d at 734.
While acknowledging that this interpretation is “not without foundation,” the First Circuit cautioned: “But BOCA’s argument overlooks another aspect of the ownership theory discussed in these cases.” Id. BOCA then identifies the real premises of Banks and related cases: the “metaphorical concept of citizen authorship” of the law, together with “the very important and practical policy that citizens must have free access to the laws which govern them.” Id. BOCA cited the authorship rationale for Banks only to find it unsatisfactory. In our view, BOCA was correct.
Only by bifurcating Banks can SBCCI achieve its purpose of claiming authorship of “the law” and proprietary rights in its codes that have been enacted into law. However, the acceptance of SBCCI’s and the dissent’s theory, that non-governmental employees who draft model statutes or regulations may be entitled to copyright protection, raises troubling issues. The complexities of modern life and the breadth of problems addressed by government entities necessitate continuous participation by private experts and interest groups in all aspects of statutory and regulatory lawmaking. According to SBCCI, a utilitarian test should be invoked to determine which organizations “need” the incentives provided by the Copyright Act in order to perform the public service of drafting specialized statutes, ordinances or regulations. Alternatively, perhaps SBCCI and the dissent intend that whenever any private “author” finds his or her proposal adopted verbatim in law, copyright protection may be claimed.[9] As an example, three law professors have taken credit for drafting a recent federal statute on supplemental federal court jurisdiction. See 28 U.S.C. § 1367; Christopher M. Fairman, Abdication to Academia: The Case of the Supplemental Jurisdiction Statute, 28 U.S.C. § 1367, 19 SETON HALL LEGIS. J. 157 (1994). Under SBCCI’s reasoning, it is likely that these professors, had they so desired, could have asserted a copyright in their “model supplemental jurisdictional provision.”[10] *799 SBCCI offers no outer limit on claims of copyright prerogatives by nongovernmental persons who contribute to writing “the law.”
Not only is the question of authorship of “the law” exceedingly complicated by SBCCI’s and the dissent’s position, but in the end, the “authorship” question ignores the democratic process. Lawmaking bodies in this country enact rules and regulations only with the consent of the governed. The very process of lawmaking demands and incorporates contributions by “the people,” in an infinite variety of individual and organizational capacities. Even when a governmental body consciously decides to enact proposed model building codes, it does so based on various legislative considerations, the sum of which produce its version of “the law.” In performing their function, the lawmakers represent the public will, and the public are the final “authors” of the law.
The BOCA decision put it thus:
The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process.
628 F.2d at 734.[11] This “metaphorical concept of citizen authorship” together with the need for citizens to have free access to the laws are the ultimate holding of Banks. Id.
BOCA described free access as a policy “based on the concept of due process,” the people’s right to know what the law requires so that they may obey it and avoid its sanctions. SBCCI and the dissent contend that this “due process” reasoning involves nothing more than the factual issue of “sufficient” public access to the building codes of Anna and Savoy. Since a copy of the codes is available for inspection and individual copying in a public office, SBCCI contends that the obligations of due process are fulfilled.
We disagree that the question of public access can be limited to the minimum availability that SBCCI would permit. Banks does not use the term “due process.” There is also no suggestion that the Banks concept of free access to the law is a factual determination or is limited to due process, as the term is understood today. Instead, public ownership of the law means precisely that “the law” is in the “public domain” for whatever use the citizens choose to make of it. Citizens may reproduce copies of the law for many purposes, not only to guide their actions but to influence future legislation, educate their neighborhood association, or simply to amuse. If a citizen wanted to place an advertisement in a newspaper quoting the Anna, Texas building code in order to indicate his dissatisfaction with its complexities, it would seem that he could do so. In our view, to say, as Banks does, that the law is “free for publication to all” is to expand, not factually limit, the extent of its availability.
Moreover, as the BOCA decision observed, it is difficult to reconcile the public’s right to know the law with the statutory right of a copyright holder to exclude his work from any publication or dissemination. SBCCI responds that due process must be balanced against its proprietary rights and that the fair use doctrine as well as its honorable intentions will pre *800 vent abuse. Free availability of the law, by this logic, has degenerated into availability as long as SBCCI chooses not to file suit.[12]
For these reasons, we reject SBCCI’s deconstruction of Banks into merely utilitarian and factual issues. Instead, we read Banks, Wheaton, and related cases consistently to enunciate the principle that “the law,” whether it has its source in judicial opinions or statutes, ordinances or regulations, is not subject to federal copyright law.[13]
To sum up this section, we hold that when Veeck copied only “the law” of Anna and Savoy, Texas, which he obtained from SBCCI’s publication, and when he reprinted only “the law” of those municipalities, he did not infringe SBCCI’s copyrights in its model building codes. The basic proposition was stated by Justice Harlan, writing for the Sixth Circuit: “any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book ...” Howell v. Miller, 91 F. 129, 137 (6th Cir.1898).[14] See Jerry E. Smith, Government Documents: Their Copyright and Ownership, 22 Copyright Symposium 147, 174 (ASCAP 1977), reprinted in 5 Tex. Tech L. Rev. 71, 92 (1973).
II. The Copyright Act
A. The Merger Doctrine
As we earlier stated, SBCCI is the “author” of model building codes that, qua model building codes, are facially copyright-protected. This is true even if Banks places the building codes of Anna and Savoy, and other governmental entities that adopted part or all of SBCCI’s model codes, in the public domain. But if the holding of Banks fails, Veeck alternatively asserts a defense under the Copyright Act to the protection of the model codes after they have been enacted into positive law. Once adopted, he asserts, the model codes become “facts” that are not protected under the Copyright Act. Further, because there is only one way to express the meaning of the building codes, the “idea” embodied in the law merges with SBCCI’s expression, and at that point, renders copyright protection unavailable.
It is not the sole purpose of copyright law to secure a fair return for an author’s creative labor. Under the Constitution,
The primary objective of copyright is not to reward the labor of authors but “[to] promote the Progress of Science and the useful Arts.” Article I, Sec. 8, clause 8 [U.S. Constitution]. To this end, copyright law assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of author-ships.
*801 Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349, 111 S.Ct. 1282, 1289-90, 113 L.Ed.2d 358 (1991). The statute excludes from copyright protection ideas, procedures, processes, systems, methods of operation, or information in the public domain. See 17 U.S.C. § 102(b); Feist Publications, 499 U.S. at 350, 111 S.Ct. at 1290 (citation omitted); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547-48, 105 S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985). If an idea is susceptible to only one form of expression, the merger doctrine applies and § 102(b) .excludes the expression from the Copyright Act. As the Supreme Court has explained it, this “idea/expression dichotomy strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author’s expression.” Harper & Row, 471 U.S. at 556, 105 S.Ct. at 2228.
Veeck copied the building code of the towns of Anna and Savoy, Texas, based on their adoption of a version of the SBCCI model code. The codes are “facts” under copyright law. They are the unique, unalterable expression of the “idea” that constitutes local law. Courts routinely emphasize the significance of the precise wording of laws presented for interpretation. See, e.g., Consumer Product Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (“[T]he starting point for interpreting a statute is the language of the statute itself.”). Judge Little, dissenting from the panel opinion in this case, observed that
... the merger doctrine is especially appropriate because other methods of expressing the idea are foreclosed, [citation omitted] An individual wishing to publish the text of a law cannot develop his own, unique version and still publish an authoritative copy.
Veeck v. Southern Bldg. Code Cong. Int’l, 241 F.3d 398, 416 (5th Cir.2001) (Little, J., dissenting). It should be obvious that for copyright purposes, laws are “facts”: the U.S. Constitution is a fact; the Federal Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less “facts” than the products of more august legislative or regulatory bodies. While the Supreme Court has not stated directly that laws are “facts,” it has broadly observed that, as with census data, “the same is true of all facts — scientific, historical, biographical and news of the day. ‘They may not be copyrighted and are part of the public domain available to every person.’ ” Feist, 499 U.S. at 348, 111 S.Ct. at 1289.
Emphasizing not the language of § 102(b), but the “policy” of the merger doctrine, SBCCI contends that merger poses no bar to copyright protection here. The idea/expression dichotomy was enacted into law by Congress to “balance [ ] the competing concerns of providing incentive to authors to create and foster[ ] competition in such creativity.” Kern River Gas Transmission Co. v. The Coastal Corp., 899 F.2d 1458, 1463 (5th Cir.1990).[15] Veeck’s merger argument ignores the goal of fostering competition in creativity. SBCCI thus asserts that “merger would only apply in this case if a subsequent author seeking to create a building code for Anna or Savoy would have to use the same expression to convey the idea.” SBCCI supplemental en banc brief at 7. This argument effectively converts the merger doctrine from a limit on copyright-ability into a mere defense against infringement based on the identity of the *802 author. In our view § 102(b) does foster the creativity that SBCCI applauds, but it does so by permitting the free flow of information in facts and ideas from their emergence, rather than as a defense to infringement claims. See Kern River at 1460; Mason v. Montgomery Data, Inc., 967 F.2d 135, 138 n. 5 (5th Cir.1992) (“Mason argues that application of the merger doctrine does not render a work uncopy-rightable, but rather prevents a finding of infringement of an otherwise copyrightable work. But this court has applied the merger doctrine to the question of copy-rightability.”).
SBCCI and the dissent next urge the inapplicability of the merger doctrine because there are many possible ways to express model codes: both the multiplicity of building standards and the variety of ways to express those standards compel the conclusion that the ideas have not merged with their expression. Cf. Mason, 967 F.2d at 139 (rejecting merger because the idea embodied in the author’s maps can be expressed in a variety of ways). What SBCCI and the dissent ignore, however, is the graphic merger of its model building codes with “the law” as enacted by Anna and Savoy, Texas. Veeck copied from SBCCI’s model codes, 1994 edition, because those codes were transformed into the “fact” and “idea” of the towns’ building codes. Veeck could not express the enacted law in any other way.
The final argument deployed by SBCCI and the dissent casts the merger doctrine as an inherent balancing test in which courts must reconcile the policies underlying the Copyright Act with the public interest in the free flow of information and ideas. Compare CCC Info Serv., Inc. v. Maclean Hunter Market Reports, Inc., 44 F.3d 61, 68 (2nd Cir.1994) (interpreting Second Circuit’s balancing test). It is true that where the line is unclear between expression and facts, procedures, processes, methods of operation, or information in the public domain, a court considering the applicability of § 102(b) must recur to the statute’s underlying policy. See, e.g., Feist, 499 U.S. at 361-64, 111 S.Ct. at 1295-97 (determining copyright-ability of compilations of facts); Mason, 967 F.2d at 139 (copyrightability of expression in maps). This case, however, is not close. The building codes of Anna and Savoy, Texas can be expressed in only one way; they are facts. Veeck placed those facts on his website in precisely the form in which they were adopted by the municipalities.[16] When the § 102(b) dichotomy is clear, judges are not permitted to substitute policy choices for the legislature’s determination.
We emphasize that in continuing to write and publish model building codes, SBCCI is creating copyrightable works of authorship. When those codes are enacted into law, however, they become to that extent “the law” of the governmental entities and may be reproduced or distributed as “the law” of those jurisdictions.
B. Other Provisions[17]
SBCCI’s amici make much of provisions of the Copyright Act that, they contend, should protect SBCCI’s copyrights from “appropriation” by local government entities. Section 105 of the Act, taken togeth *803 er with the definition of “works of the government,” denies copyright protection to official works of the United States Government, while reserving the possibility that government employees and contractors may obtain, or transfer to the government, copyrights for non-official works. 17 U.S.C. §§ 105, 101. On its face, these provisions say nothing about the relationship between non-federal government entities and copyright holders. Moreover, they have never been held inconsistent with Banks or with the merger doctrine.
Section 201(e) of the Act reflects Congress’s intention to protect copyrights from involuntary appropriation by government entities. 17 U.S.C. § 201(e). This is not, however, a “takings” case, not least because SBCCI urged localities to adopt its model codes. The issue in the case is not the voluntariness of the appropriation but the legal consequences flowing from the permission that SBCCI gave.
III. The Caselaw; Model Codes Versus Standards
Until recently in our history, it was understood that Wheaton, Banks and nearly every other pertinent case held that copyright protection may not be asserted for the text of “the law”.[18] The basic proposition was stated by Justice Harlan, writing for the Sixth Circuit: “any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book ...” Howell v. Miller, 91 F. 129, 137 (6th Cir.1898).
As of 1980, the noncopyrightability of “the law” appeared settled to the First Circuit in BOCA. The court focused on the real holding of Banks and accordingly vacated preliminary injunctive relief to the author of a building code adopted into law by the Commonwealth of Massachusetts.[19] The court held that BOCA had failed to carry its burden of distinguishing, for preliminary relief purposes, the Massachusetts building code from non-copyrightable statutes and judicial opinions. But the court then remanded the case for further development in light of the novelty of the issue, the insufficiency of the trial court record, and the apparent trend toward adoption of model codes by governmental entities. The court nevertheless was skeptical that BOCA would prevail, commenting
it is hard to see how the public’s essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder ...
BOCA, 628 F.2d at 730. Though not a definitive holding, BOCA clearly favors Veeck’s position over that of SBCCI, and it is most closely on point.
The record has been developed in this case and, with the perspective gained from other recent caselaw and from the multiple submissions to the court, we have no hesitation in confirming BOCA’s predisposition against the copyrightability of model codes to the extent they have been adopted as law.. But the limits of this holding must be explained. Several national standards-writing organizations joined SBCCI as amici out of fear that their copyrights may be vitiated simply by the common practice of governmental enti *804 ties’ incorporating their standards in laws and regulations.[20] This case does not involve references to extrinsic standards. Instead, it concerns the wholesale adoption of a model code promoted by its author, SBCCI, precisely for use as legislation. Caselaw that derives from official incorporation of extrinsic standards is distinguishable in reasoning and result. See CCC Info. Services v. Maclean Hunter Market Reports, Inc., 44 F.3d 61 (2nd Cir.1994); and Practice Management Info. Corp. v. American Medical Ass’n, 121 F.3d 516 (9th Cir.1997), opinion amended by 133 F.3d 1140 (9th Cir.1998).
In CCC Information Services, a New York statute required insurance companies to use the “Red Book,” a privately prepared and copyrighted list of projected automobile values, as one of several standards in calculating the payments upon the total loss of a vehicle. CCC Information Services systematically loaded portions of the Red Book onto its computer network and distributed the information to its customers. One of CCC’s theories was that the Red Book had entered the public domain. The Second Circuit addressed the public domain issue briefly, stating that “we are not prepared to hold that a state’s reference to a copyrighted work as a legal standard for valuation results in loss of the copyright.” CCC Info. Services, 44 F.3d at 74. CCC notes the infringer’s reliance on the BOCA decision, but it does not opine on that case, confining itself to the precise facts before the court.
Practice Management involved the American Medical Association’s copyrighted coding system for reporting physicians’ services and medical procedures. The Federal Health Care Financing Administration (HCFA) contacted and then agreed with AMA to use the AMA’s coding system for identifying physicians’ services on Medicare and Medicaid reimbursement forms. AMA granted a “non-exclusive, royalty-free and irrevocable” license to HCFA, without restrictions on the government’s ability to reproduce or distribute AMA’s codes. There was no evidence that AMA had restricted the code’s availability to anyone. The Ninth Circuit held that the HCFA’s decision to adopt regulations requiring physicians to use a version of the AMA code on Medicaid claim forms did not place the code in the public domain under Banks. Practice Management, 121 F.3d at 519 (“[T]he AMA’s right under the Copyright Act to limit or forgo publication of the [coding system] poses no realistic threat to public access.”).
Both the Second and Ninth Circuits feared that reaching the opposite conclusion in those cases would have “expose[d] copyrights on a wide range of privately authored model codes, standards, and reference works to invalidation.” Practice Management, 121 F.3d at 519. The Ninth Circuit suggested that federal court rules regarding citations could invalidate the copyrightability of the Blue Book. Id. at 519 n. 5. The Second Circuit feared that a ruling in favor of CCC Information Systems would call into question the copy-rightability of school books once they were assigned as part of a mandatory school curriculum. CCC Info Services, 44 F.3d at 74.
These decisions, and the hypothetical situations they discuss, are all distinguishable from Veeck. If a statute refers to the Red Book or to specific school books, the law requires citizens to consult or use a copyrighted work in the process *805 of fulfilling their obligations. The copyrighted works do not “become law” merely because a statute refers to them. See 1 Goldstein CopyRight, § 2.49 at n. 45.2 (noting that CCC and Practice Management “involved compilations of data that had received governmental approval, not content that had been enacted into positive law”). Equally important, the referenced works or standards in CCC and Practice Management were created by private groups for reasons other than incorporation into law. To the extent incentives are relevant to the existence of copyright protection, the authors in these cases deserve incentives. And neither CCC nor AMA solicited incorporation of their standards by legislators or regulators. In the case of a model code, on the other hand, the text of the model serves no other purpose than to become law. SBCCI operates with the sole motive and purpose of creating codes that will become obligatory in law.
At first glance, Practice Management appears to pose a closer issue because the HCFA did not simply refer physicians to the AMA’s coding system. The court’s opinion directs the reader to HHS’s notice in the Federal Register announcing that HCFA would require physicians to
use exclusively a common procedure coding system. The system is the HCFA common procedure coding system (HCPCS). This coding system is to be used for coding procedures that have been performed ... and is basically used for determining reimbursement amounts. HCFA developed the HCPCS in 1979 and 1980 by using the AMA’s CPT-4 [the copyrighted coding system] for physician services and adding HCFA-developed codes for some non-physician services. In addition, we developed conversion techniques to prevent unwarranted payment escalation.
50 Fed.Reg. 40895, 40897. To be precise, then, HCFA had its own coding system (the HCPCS) that incorporated AMA’s code but also included additional information.
But unlike Veeck, Practice Management Information Corporation, a commercial publisher of medical textbooks, was not trying to publish its own version of the HCPCS. Practice Management desired to sell a cheaper edition of the AMA’s code, which was also used by insurance companies and had other non-governmental uses. It is not clear how the Ninth Circuit would have decided the case if Practice Management had published a copy of the HCPCS. By analogy, the result in this case would have been different if Veeck had published not the building codes of Anna and Savoy, Texas, but the SBCCI model codes, as model codes.
IV. Policy Arguments
Many of SBCCI’s and the dissent’s arguments center on the plea that without full copyright protection for model codes, despite their enactment as the law in hundreds or thousands of jurisdictions, SBCCI will lack the revenue to continue its public service of code drafting. Thus SBCCI needs copyright’s economic incentives.[21]
Several responses exist to this contention. First, SBCCI, like other code-writing organizations, has survived and grown over 60 years, yet no court has previously awarded copyright protection for the copying of an enacted building code under circumstances like these. Second, the success of voluntary code-writing *806 groups is attributable to the technological complexity of modern life, which impels government entities to standardize their regulations. The. entities would have to promulgate standards even if SBCCI did not exist, but the most fruitful approach for the public entities and the potentially regulated industries lies in mutual cooperation. The self-interest of the builders, engineers, designers and other relevant tradesmen should also not be overlooked in the calculus promoting uniform codes. As one commentator explained,
... it is difficult to imagine an area of creative endeavor in which the .copyright incentive is needed less. Trade organizations have powerful reasons stemming from industry standardization, quality control, and self-regulation to produce these model codes; it is unlikely that, without copyright, they will cease producing them.
1 Goldstein § 2.5.2, at 2:51.[22]
Third, to enhance the market value of its model codes, SBCCI could easily publish them as do the compilers of statutes and judicial opinions, with “value-added” in the form of commentary, questions and answers, lists of adopting jurisdictions and other information valuable to a reader. The organization could also charge fees for the massive amount of interpretive information about the codes that it doles out. In short, we are unpersuaded that the removal of copyright protection from model codes only when and to the extent they are enacted into law disserves “the Progress of Science and useful Arts.” U.S. Const, art. I. § 8, cl. 8.

CONCLUSION

For the reasons discussed above, we REVERSE the district court’s judgment against Peter Veeck, and REMAND with instructions to dismiss SBCCI’s claims.

. The facts stated here are undisputed.

. We review the district court's grant of summary judgment de novo. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir.1998); Fed.R.Civ.P. 56(c). At the summary judgment stage, a court may not weigh the evidence or evaluate the credibility of witnesses, and all justifiable inferences will be made in the nonmoving party's favor. Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986)). The district court drew some inferences from the facts, however, regarding the impact of copyrightability on SBCCI's operations that, if material, should not have been decided without a trial. We find it unnecessary to reach those issues.

. See Precis of Argument by Counsel for Wheaton [pet’r], 33 U.S. (8 Pel.) at 615. Wheaton acknowledged, even while arguing that judicial opinions could be copyrighted, that “it would be absurd, for a legislature to claim the copyright; and no one else can do it, for they are the authors, and cause them to be published without copyright.... Statutes were never copyrighted.” Id. Further, "it is the bounden duty of government to promulgate its statutes in print ...” Id. at 616.
Counsel for Peters, the respondent, emphasized the governing policy that "all countries ... subject to the sovereignty of the laws” hold the promulgation of the laws, from whatever source, "as essential as their existence.” Id. at 618-19. Peters's brief continues:
It is, therefore, the true policy, influenced by the essential spirit of the government, that laws of every description should be universally diffused. To fetter or restrain their dissemination, must be to counteract this policy; to limit, or even to regulate it, would, in fact, produce the same effect.
If either statutes or decisions could be made private property, it would be in the power of an individual to shut out the light by which we guide our actions.
Id. at 620.

. In Davidson v. Wheelock, for example, the court stated that a compiler of state statutes "could obtain no copyright for the publication of the laws only; neither could the legislature confer any such exclusive privilege upon him.” Davidson v. Wheelock, 27 F. 61, 62 (D.Minn.1886). More famously. Justice Harlan, riding circuit, denied an injunction sought for the compiler of Michigan statutes, holding that "no one can obtain the exclusive right to publish the laws of the state in a book prepared by him.” Howell v. Miller, 91 F. 129, 137 (6th Cir.1898).

. Harrison Co. v. Code Revision Commission, 244 Ga. 325, 260 S.E.2d 30, 34 (1979); State of Ga. v. The Harrison Co., 548 F.Supp. 110, 114-15 (N.D.Ga.1982), vacated per stipulation, 559 F.Supp. 37 (N.D.Ga.1983).

.The amici supporting SBCCI’s position include Building Officials and Code Administrators International (BOCA), International Code Council, International Conference of Building Officials, American Medical Association, American National Standards Institute (ANSI), American Society of Association Executives (ASAE), American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE), American Society of Mechanical Engineers (ASME), National Fire Protection Association (NFPA), Texas Municipal League, and Underwriters Laboratories, Inc. (UL).

. Practice Management declares, “The copyright system's goal of promoting the arts and sciences by granting temporary monopolies to copyrightholders was not at stake in Banlcs because judges’ salaries provided adequate incentive to write opinions.” Id.

. If there were an independent holding in Banlcs relying on the fact that judges are paid by the public, it was rejected by the Court itself one month later, when the Court ruled that a court reporter, notwithstanding that he was a state employee, could assert copyright in all of his compilation of judicial opinions except the opinions themselves. Callaghan v. Myers, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547 (1888).

. One of SBCCI’s amici argues that this is an unrealistic threat, since, inter alia, the run-of-the-mill lobbyist or good citizen involved in the legislative process does not assert a copyright. That these "authors'' may be more generous, or less sophisticated, than the large and well-funded code-writing organizations before us hardly furnishes a reason to approve an open-ended test of authorship of the law.

. We are not stating or holding that the authorship of government works never presents a legitimate issue of copyright. On the contrary, the Copyright Act carefully defines the extent to which federal government employees and contractors can obtain copyright *799 protection. But these provisions have never been held to supersede Banlcs's holding that "the law” is in the public domain.

. Technically, citizen "ownership” of the law might suggest that local governmental entities, as public representatives, could prevent copying of the law. As Goldstein notes, the decisions holding that statutes are in the public domain prevent any such misunderstanding. 1 Goldstein, Copyright, § 2.48 at n. 42.

.SBCCI does not permit governmental entities to publish its model codes when they are enacted. Instead, it permits their adoption by reference and furnishes a copy of the adopted code to the entity. SBCCI also generously allows that if a governmental entity were to publish the building code on an Internet site to meet its due process obligation, that would be a fair use. But when the North Carolina Building Officials were permitted to publish a model code on their non-public access website, SBCCI expressly reserved its rights.

. What constitutes “the law” when a governmental entity adopts or incorporates by reference an author's copyrightable work will be considered infra, Part III.

. Our decision might well be the opposite, if Veeck had copied the model codes as model codes, or if he had indiscriminately mingled those portions of "the law” of Anna and Savoy adopted by their town councils with other parts of the model codes not so adopted.

. See id. at 1460 (proposed route for a pipeline approved by the Federal Energy Regulatory Commission was an uncopyrightable "idea”).

. For the first time, in this court, SBCCI alleges that Veeck did not exactly copy the ordinances, because in the course of their adoption, the towns rejected certain parts of the SBCCI model codes. There is no evidence in the district court record to sustain this contention.

. Veeck also raised infringement defenses based on his fair use of the model codes or SBCCI’s waiver of its copyrights. It is unnecessary to reach these issues.

. See also Texas v. West Publishing Co., 882 F.2d 171, 174, 177 (5th Cir.1989), in which the State of Texas sought a declaratory judgment that West's copyright in their original arrangement of annotated Texas statutes was invalid. This court rejected the state’s argument and observed in passing that West did not claim a copyright in the text of the statutes themselves or in any of the readily-available public compilations of statutes.

. BOCA is an amicus curiae in this case supporting SBCCI’s position.

. See 63 Fed.Reg. 8545, 8554-55 (Feb. 19, 1998) (Office of Management and Budget Notice of Final Revision of Circular A-119) (directing federal agencies to adopt privately developed standards “whenever practicable and appropriate” to "eliminate[] the cost to the Government of developing its own standards”).-

. SBCCI’s factual "evidence” on this point consisted of self-serving affidavits from its officers and employees, and proof that it earns perhaps 40% of its revenue from sales of the domestic model codes and amendments. No effort was made to show by what amount copying by people like .Veeck would or could reduce the organization's revenue.

. This court’s opinion does not, of course, withdraw all copyright protection from the model codes qua model codes.